## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: RADNOR HOLDINGS CORPORATION, et. al. § § § | |
| RADNOR HOLDINGS CORPORATION, et. al. § Debtors, § § | |
| and § § | Case No. 06-10894 (PJW) (Jointly Administered) |
| MICHAEL T. KENNEDY, MTK TRUST FBO RYAN § KENNEDY, MTK TRUST FBO SEAN M. KENNEDY, MTK § TRUST FBO MICHAELA C. KENNEDY, MTK TRUST FBO § CONOR R. KENNEDY § | JURY TRIAL REQUESTED |
| Plaintiffs, § § | Adv. No._____ |
| v. § § | |
| SKADDEN ARPS MEAGER & FLOM LLP; SK PRIVATE § INVESTMENT FUND 1998 LLC; RICHARD T. PRINS, § ESQUIRE; GREGG M. GALARDI, ESQUIRE; § TENNENBAUM & CO. LLC; TENNENBAUM CAPITAL § PARTNERS, LLC; BABSON & CO. LLC; SPECIAL § VALUE EXPANSION FUND, LLC; SPECIAL VALUE § OPPORTUNITIES FUND, LLC; MICHAEL E. § TENNENBAUM; SUZANNE S. TENNENBAUM; DAVID A. § HOLLANDER; MARK K. HOLDSWORTH; HOWARD E. § LEFKOWITZ; RICHARD E. SPENCER; JOSE § FELICIANO; ALVAREZ & MARSEL LLC and § STANFORD M. SPRINGEL § § | |
| Defendants. § § | |

## COMPLAINT

Plaintiffs, Michael T. Kennedy ("**Kennedy**"), Radnor Holdings Corporation ("**Radnor**") and

Trusts for the benefit of Kennedy's four children, ("**Kennedy Trusts**") hereby files this Complaint

against Skadden Arps Meager & Flom LLP ("**Skadde**n"), SK Private Investment Fund 1998 LLC ("**SK**

**Fund**"), Richard T. Prins, Esquire ("**Prins**"), Gregg M. Galardi, Esquire  ("**Galardi**")[1]; Tennenbaum & Co. LLC ("**Tennenbaum & Co.**"); Tennenbaum Capital Partners, LLC ("**Tennenbaum Capital**")[2], Babson & Co. LLC ("**Babson**"), Special Value Expansion Fund, LLC ("**SVEF**"), Special Value Opportunities Fund, LLC ("**SVOF**")[3], Michael E. Tennenbaum, Suzanne S. Tennenbaum, David A. Hollander ("**Hollander**"), Mark K. Holdsworth ("**Holdsworth**"), Howard E. Lefkowitz ("**Lefkowitz**"), Richard E. Spencer ("**Spencer**"), Jose Feliciano ("**Feliciano**")[4]; Alvarez & Marsel LLC ("**A&M**") and Stanford Springel ("**Springel**") seeking actual damages, delay damages and punitive damages related to fraud, conspiracy, malpractice, perjury, unjust enrichment, obstruction of justice, breach of fiduciary duty, tortious interference, theft by deception, and breach of contract.

In support of the requested relief, Kennedy states as follows:

## THE PARTIES

1.      Kennedy is the majority shareholder, chairman of the board of directors and founder of Radnor[5] and Radnor's worldwide affiliates (collectively "**Radnor**") with annual revenues of approximately $600 million and 2,400 employees in 19 locations operated worldwide throughout Europe, Canada and the United States.

2.      Radnor was the second largest manufacturer of foam products sold for food and packaging worldwide and the fifth largest producer of expandable polystyrene plastic sold globally.

3.      Skadden is one of the United States largest law firms, headquartered at Four Times

---

[1] Skadden, SK Fund, Prins and Galardi shall hereinafter collectively be referred to as the "**Skadden Parties.**"

[2] Tennenbaum & Co. LLC and Tennenbaum Capital Partners, LLC shall hereinafter collectively be referred to as "**Tennenbaum.**"

[3] SVEF and SVOF shall hereinafter collectively be referred to as the "**Tennenbaum Funds.**"

[4] Tennenbaum Capital, Tennenbaum & Co., Babson, SVEF, SVOF, Hollander, Holdsworth, Lefkowitz, Spencer and Feliciano shall hereinafter collectively be referred to as the "**Tennenbaum Parties.**"

[5] *See Exhibit 1 -* organizational chart of Radnor Holdings Corporation and its affiliates.

Square, New York, New York.  Skadden operates offices globally with annual revenue of approximately $2 billion including 1,800 attorneys and 450 partners participating in providing legal services to its clients.  Skadden can be served at its offices in New York or in Wilmington, Delaware.[6]

4.       Tennenbaum Capital is a limited liability company duly organized under the laws of the State of Delaware.   Tennenbaum Capital is a privately owned investment firm, hedge fund and investment manager and registered adviser under the Investment Advisers Act of 1940 and subject to the Securities and Exchange Act of 1933 and 1934[7].   Tennenbaum Capital owns and controls private hedge funds and other pooled vehicles, including publicly traded TCP Capital, Inc., which sold stock to public shareholders on April 2, 2012.[8] Tennenbaum has annual revenues of approximately $100 million and assets under management of approximately $8.0 billion[9].   Tennenbaum Capital[10] is controlled by Michael E. Tennenbaum, senior managing partner and founder of Tennenbaum Capital through Tennenbaum & Co. which he owns with his wife, Suzanne S. Tennenbaum.   Tennenbaum Capital's primary operations are based in Santa Monica, California.  The Complaint and Summons can be served on Tennenbaum Capital via The Corporation Trust Company, its registered agent, at Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

5.       Tennenbaum & Co. is a limited liability company duly organized under the laws of the

[6] *See Exhibit 2* – Transcript of hearing before the Honorable Peter J. Walsh, United States Bankruptcy Judge, on September 20, 2006 (the "**September 20 Transcript**"), specifically statements  regarding Skadden firm, revenues and other remarks by attorney Galardi.

[7] *See Exhibit 3(A), Exhibit 3(B) and Exhibit 3(C)* - offering memoranda for Tennenbaum Funds and Form 17(d) filing with SEC by Tennenbaum Capital.  Tennenbaum Capital is subject to the Investment Advisers Act of 1940 and rules promulgated thereunder including its own code of ethics and conduct as an adviser.

[8] *See Exhibit 4* - TCP Capital, Inc. registration statement and offering prospectus under the symbol TCPC.

[9] *See Exhibit 3(A), Exhibit 3(B) and Exhibit 3(C)* - offering memoranda for Tennenbaum Funds and Form 17(d) filing with SEC by Tennenbaum Capital.

[10] *See Exhibit 3(A), Exhibit 3(B) and Exhibit 6(B)* – offering memorandum for Tennenbaum Funds and Form ADV filed with SEC.

State of Delaware and the managing member of Tennenbaum Capital which controls its day to day operations. Tennenbaum & Co. receives a substantial majority of the profits of Tennenbaum Capital. Tennenbaum & Co. is also owned entirely by Michael E. Tennenbaum and Suzanne S. Tennenbaum.[11] The Complaint and Summons can be served on Tennenbaum Capital via The Corporation Trust Company, 1209 Orange Street, Wilmington, Delaware 19801.

6.      Michael E. Tennenbaum is the senior managing partner of Tennenbaum Capital and majority interest holder of Tennenbaum & Co. with Suzanne S. Tennenbaum. Michael Tennenbaum, directly and indirectly holds a 65 percent interest in Tennenbaum Capital and a 50 percent interest in Tennenbaum & Co. The Complaint and Summons can be served on Michael E. Tennenbaum at his place of residence at 118 Malibu Colony Road, Malibu, California 90265-6624.

7.      Suzanne S. Tennenbaum is a holder of a fifty percent membership interest in Tennenbaum & Co.[12] The Complaint and Summons can be served on Suzanne S. Tennenbaum at her place of residence at 118 Malibu Colony Road, Malibu, California 90265-6624.

8.      Prins is a partner of Skadden, handling securities matters and corporate governance matters for the Tennenbaum Funds. The Complaint and Summons can be served on Prins at his place of residence at 320 Central Park West, Apartment 21C, New York, New York 10025.

9.      Galardi is currently a partner with and co-head of the restructuring practice of DLA Piper LLP. Formerly, Galardi was a partner of Skadden during the time period relevant to this Complaint. The Complaint and Summons can be served on Galardi at his place of residence at 1115 Brandon Lane, Wilmington, Delaware 19807.

---

[11] *See Exhibit 6(A), Exhibit 6(B) and Exhibit 6(C)* - organization chart of Tennenbaum Affiliates and Form ADV I and ADV II filed with the SEC.

[12] *See Exhibit 6(B) and Exhibit 6(A)* - Form ADV filed with the SEC and organizational chart of Tennenbaum Funds and affiliates.

10.    Hollander is a managing partner of Tennenbaum Capital, general counsel of the Tennenbaum affiliates and an officer of the Tennenbaum Funds.  The Complaint and Summons can be served on Hollander at his place of residence at 16510 Sunset Blvd, Pacific Palisades, California 90272.

11.    SK Private Investment Fund 1998 LLC, is one of the investment funds owned and controlled entirely by Skadden to make cash investments, provided by its qualified partners and employees, in various client opportunities which operates under exemption from registration under the 1940 Investment Advisers Act of 1940[13], its registered agent, at Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

12.    A&M is a global financial service conglomerate with estimated annual revenues of $2 billion, which provides financial advisory services to clients worldwide through its professionals including restructurings, reorganizations and complex matters.  The Complaint and Summons can be served on A&M via The Corporation Trust Company, its registered agent, at Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801 or at its corporate offices at one of its many offices located in New York, Los Angeles or Philadelphia.

13.    SVEF, an affiliated fund of Tennenbaum Capital, is a limited liability company duly organized under the laws of the State of Delaware. The Complaint and Summons can be served on SVEF via The Corporation Trust Company, its registered agent, at Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

14.    SVOF, an affiliated fund of Tennenbaum Capital, is a limited liability company duly organized under the laws of the State of Delaware. The Complaint and Summons can be served on SVOF via The Corporation Trust Company, its registered agent, at Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

---

[13] *See Exhibit 7(a) and Exhibit 7(b)* - application of Skadden on behalf of a series of employees' securities company funds for exemption under section 2(a)(13) 1940 Advisers Act as filed with the SEC.

15.    Holdsworth is a managing partner of Tennenbaum Capital, a member of the board of several of Tennenbaum affiliates and an officer of the Tennenbaum Funds.  The Complaint and Summons can be served on Holdsworth at his place of residence at 1386 Orlando Road, San Marino, California 91108.

16.    Lefkowitz is a managing partner of Tennenbaum Capital, a member of the board of several of the Tennenbaum affiliates and an officer of the Tennenbaum Funds.  The Complaint and Summons can be served on Lefkowitz at his place of residence at 1916 Roxbury Drive, Beverly Hills, California 90035.

17.    Babson is a unit of Manufacturers Life Insurance Company and a co-manager of the Tennenbaum Funds.  Babson, an investor and affiliate of Tennenbaum Capital, is a limited liability company duly organized under the laws of the State of Delaware. The Complaint and Summons can be served on Babson via The Corporation Trust Company, its registered agent, at Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

18.    Spencer is a vice president and managing director of Babson and a voting member of the investment committee of the Tennenbaum Funds.  The Complaint and Summons can be served on Spencer at his place of residence at 122 Ardsley Road, Longmeadow, Massachusetts 01106.

19.    Feliciano is a managing director of Clearlake Capital Partners, LLC.  Formerly, Feliciano was a partner of Tennenbaum Capital during the time period relevant to this Complaint.  The Complaint and Summons can be served on Feliciano at his place of residence at 233 21st Street, Apartment 4A, New York, New York 10011.

20.     Springel is a managing director at A&M. The Complaint and Summons can be served on Springel at his place of residence at 110 Edinburgh Circle, Danville, California 94526.

**JURISDICTION & VENUE**

21.    This Court has jurisdiction and venue is proper in this Court as many of the acts, misrepresentations and omissions occurred before this Court.  This Court should maintain jurisdiction over this matter, determining sanctions, damages and other relief which may be required.

**PRELIMINARY STATEMENT**

22.    This cause of action arises from false testimony, misrepresentation, non-disclosure, willful misconduct, gross negligence and deception committed by Defendants individually and in concert with each other and before the Honorable Peter J. Walsh for the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") to the detriment of Radnor and Kennedy.

23.    The Defendants are large and sophisticated institutions, who intentionally assumed positions of trust to Plaintiffs, then colluded, committing numerous acts of deceit and misconduct, in order to enrich themselves in breach of their fiduciary duties and violated numerous state and federal laws in the process.

24.    Plaintiff, Kennedy notified this Honorable Court of his recent discovery of evidence of impropriety by the Defendants in the Radnor case from his review of the record in preparation for the hearing on Kennedy's objection before the Honorable Peter J. Walsh for the Bankruptcy Court held on March 15, 2012.

25.    On advice of counsel, due to the sensitivity of the matters involved and seriousness of the discovered misconduct, Kennedy delivered his findings in the form of a cover letter together with the substantial evidence and exhibits to the office of the United States Trustee for the District of Delaware (the "**US Trustee**") on July 24, 2012.  In addition, Kennedy, contemporaneously delivered a copy of the

cover letter to the U.S. Trustee to the general counsel's office of the defendant Skadden.[14]

26.     Despite their duty to notify this Honorable Court, both Skadden and the office of the U.S. Trustee failed to raise to the Court, the evidence as to acts of willful misconduct and gross negligence. On September 10, 2012 the Bankruptcy Court confirmed the Radnor Plan of liquidation based on an incomplete record and absent the evidence of willful misconduct and acts of gross negligence as described herein.

27.     The willful misconduct of Defendants includes, but is not limited to: fraud, conspiracy, malpractice, perjury, unjust enrichment, obstruction of justice, breach of fiduciary duty, tortious interference, theft by deception, and breach of contract.

28.     Defendants acting individually or in concert with each other, knowingly and willfully developed a carefully orchestrated plan to fraudulently induce Radnor and Kennedy to take, or refrain from taking, certain action and to enter into various agreements.   Defendants intentionally and continuously misrepresented material facts to and carefully hid damaging information from Kennedy, the Radnor board of directors, the US Trustee and the Bankruptcy Court in order to carry out their unlawful scheme.[15]

29.     Defendants failed to disclose material conflicts and connections and willfully misrepresented those facts and adverse conflicts to Plaintiffs in order to gain a position of trust with Radnor and Kennedy. The Defendants also intentionally deceived Kennedy and other stakeholders, and ultimately obstructed and undermined Kennedy's efforts to restructure, then, reorganize Radnor. Defendants acted in concert and committed egregious acts of fraud, so as to orchestrate a sale of

---

[14] *See Exhibit 5* - Copy of cover letter and referenced enclosures as delivered to Ms. Jane M. Leamy, trial attorney, U.S. Bankruptcy Trustee for the District of Delaware on July 24, 2006.

[15] 18 U.S.C. §152, 18 U.S.C. §157, 18 U.S.C. §371 and Rule 2014 compels disclosure; Attorneys are not to edit nor decide that some connections are too trivial to be disclosed; Only the Court is to decide which adverse interests or connections are material and disqualify attorney as interested party.

Radnor's assets to the exclusive benefit of the Tennenbaum defendants and breached their duties of disclosure and loyalty to Plaintiffs as well as the Court.

30.    The gross misconduct, unlawful acts and omissions of the Defendants inflicted severe harm upon the Plaintiffs, including (i) loss of business ownership, (ii) loss of business value; (iii) loss of income, and (iv) loss of other property, including but not limited to proceeds from the sale of subsidiaries unlawfully sold.

31.    The Plaintiffs seek to recover damages for the loss of their property, the income denied them under Kennedy's employment agreement with Radnor, opportunities lost due to the Defendants fraud committed upon them, interest and delay damages since the date of the fraudulent acts and punitive damages for the egregious and aggravating misconduct of Defendants.

### **FACTS**

32.    Kennedy founded Radnor in 1991 and through new product introductions, dedication to customer service and acquisitions, grew his family's business to over $600 million in annual revenue and became a key supplier of proprietary products to the worldwide fast food restaurant chain, McDonalds Corporation ("McDonalds") and other major food service establishments and distributed its foodservice and chemical products through its 19 locations throughout the United States, Canada and Europe.[16]

33.    Radnor was awarded significant contracts for the production of proprietary products for McDonalds and was preparing for its initial public offering in 2004 and 2005.

34.    Kennedy was chairman of the board of directors of Radnor and held super majority voting interests in Radnor.  Kennedy, together with his family, owned eighty (80%) percent of the share capital

---

[16] *See Exhibit 8(a) and Exhibit 8(b)* - Form 10k for the period ended December 31, 2005 and 2006 together with Form S-1 filed with the SEC.

of Radnor and its worldwide affiliates[17].

35.     Radnor, Kennedy, Kennedy's family and other family businesses and affiliates were clients of Skadden for nearly a decade, from 1997 through 2006.  Skadden provided legal representation to Radnor and Kennedy in numerous complex matters including mergers and acquisitions, litigation in the United States and Europe as well as general corporate and governance matters.  Radnor was a public registrant under the securities laws since 1997 and had a series of unsecured and secured bonds which were traded.

36.     Unbeknownst to Kennedy, Skadden also had developed a legal advisory relationship with Tennenbaum & Co. and Tennenbaum Capital during the same timeframe.  During 2004, Tennenbaum raised $3.75 billion through the formation of the Tennenbaum Funds which were structured as collateral debt obligations (CDOs) similar to mutual funds, however sold only to qualified institutional buyers or accredited purchasers under the securities laws.  Skadden represented Tennenbaum with respect to the complex formation of the Tennenbaum Funds, SEC regulatory and general governance matters related to the Tennenbaum Funds.   Unbeknownst to Kennedy and the Radnor board, Skadden was paid approximately $3.1 million in 2004 and $1.0 million in 2005 by Tennenbaum and the Tennenbaum Funds and continued to pay legal fees for services to Skadden in 2006.

37.     Lehman Brothers, Inc. ("**Lehman**") acted as financial placement agent and Morgan Stanley, Inc. ("**Morgan Stanley**") was syndicate agent to Tennenbaum for the marketing of the securities sold to investors in 2004 and 2005.  Tennenbaum paid a total of $25 million in fees related to creation of the Tennenbaum Funds and the sale of the securities to investors.  Unbeknownst to Kennedy, Lehman and Morgan Stanley were paid approximately, $3.75 million and $17.5 million, respectively, in advisory

---

[17] In 1996, Kennedy established the Michael T. Kennedy Trusts for his four children which owned 42 percent of the non-voting shares of Radnor. Kennedy owned 80 percent of the voting shares of Radnor and a 40 percent financial interest in the shares of Radnor, constituting over 80 percent of the total share capital of Radnor and its worldwide affiliates.

fees related to the Tennenbaum Funds.[18]

38.     Radnor was growing rapidly due to the introduction of the new packaging products and rising prices in the packaging industry attributed to higher prices for energy and raw materials.  Radnor had explored a public offering of its common stock in early 2004 and again in February 2005, but hesitated due to the volatility of raw material costs.  In addition, Radnor wanted to reflect the increased profitability as a result of the launch of the new innovative packaging products for McDonalds which profits were estimated to exceed $75 million in revenues in 2006.[19]

39.     Never, in its 15 year history, did Radnor sell equity to an outsider.  One hundred percent of Radnor was owned by Radnor's management and was controlled by Kennedy and his family trusts.

40.      During 2004 and 2005, Kennedy had numerous discussions with Lehman and Merrill Lynch to underwrite the offering of common stock of Radnor to the public in an initial public offering of its shares.  Kennedy continued these discussions with Lehman and Merrill Lynch in 2005 and began discussions with other underwriters in the fall of 2005.

41.     In May 2005, Kennedy met with Lehman and Merrill Lynch & Co. Inc. ("**Merrill Lynch**") to hear presentations for the initial public offering of Radnor's common shares, valuation of those shares and dilution analysis.  Lehman and Merrill Lynch both had long experience with Kennedy and Radnor, were aware of the valuable contracts which Radnor had been awarded by McDonalds for new proprietary products as part of a new product launch scheduled for September of 2005.[20]

42.     Lehman and Merrill Lynch recommended the sale of Radnor's European chemical operations for an estimated $70 million, followed by initial public offering of approximately $100 million

---

[18] *See Exhibit 9(A)(i),Exhibit 9(A)(ii) Exhibit 9(B)(i), Exhibit 9(B)(ii), Exhibit 9(C)(i) and Exhibit 9(C)(ii)* - certified financial statements of the Tennenbaum Funds for periods ended 2004, 2005 and 2006.

[19] *See Exhibit 10* - award letters from McDonalds related to proprietary products and existing contracts.

[20] *See Exhibit 11* - IPO presentation materials and analysis prepared by Lehman and Merrill Lynch.

of Radnor's shares.  Kennedy had been preparing Radnor for its public offering of shares since the fall of 2003, filing a registration statement with the Securities and Exchange Commission (the "**SEC**"), selling non-core assets and assembling an independent board of directors.[21]

43.     Radnor was a public registrant under the Securities and Exchange Act of 1934 since 1997 and its secured long term notes were registered and traded publicly. [22] The resulting public offering would substantially reduce Radnor's debt and position the company for further growth and provide a liquid market for existing shareholders and management who assisted Kennedy in building Radnor over the preceding 15 years.

44.     Both Lehman and Merrill Lynch believe that Radnor would receive a premium for its shares upon the separation of chemical operations from the rapidly growing, non-cyclical packaging business, its new innovative and proprietary products, and lucrative contracts with McDonalds.

45.     The underwriters valued Radnor shares in excess of $300 million and Kennedy's ownership interest at approximately $150 million, after dilution for the newly issued shares.  The underwriters recommended an interim financing to raise the required capital to launch the new products for McDonalds followed by the initial public offering.[23]

46.     Due to the large and significantly profitable contracts awarded Radnor by McDonalds and the timelines for launch of the products, Radnor was required to stock many millions of the units of product in inventory months before the shipment of the products to McDonalds distribution centers throughout the United States.

47.     In order to fulfill this requirement, Radnor required sufficient capital to purchase the

---

[21] *See Exhibit 11* – IPO presentation materials and analysis prepared by Lehman and Merrill Lynch.
[22] *See Exhibit 8(a) and Exhibit 8(b)*  - Radnor filings with the SEC.

[23] *See Exhibit 13(a) and Exhibit 13(b)* - engagement letter and presentation materials from Lehman and Colchester Capital Securities LLC ("Colchester").

materials, equipment and working capital to provide the products on a timely basis. The Radnor board believed that it needed approximately $35 million to complete the product introductions on a timely basis to its largest customer.

48.    Radnor engaged Lehman and Colchester Securities Corporation LLC ("Colchester") to assist in raising the needed financing and obtain the required consents from the secured bond holders and negotiate a possible debt for equity exchange with its unsecured bondholders in advance of its initial public offering of common stock.

49.    Lehman presented Radnor with four alternatives to raise the capital it needed: (i) potential asset sales; (ii) a private placement offering; (iii) an initial public offering; or (iv) a sale or merger of Radnor. Radnor decided to proceed with a private placement offering and instructed Lehman to develop terms of such an offering.

50.    From April through May 2005, Lehman worked to develop various terms as requested by Radnor, finally proposing that Radnor embark on a $50 million private placement transaction in which Radnor would issue $20 million of convertible preferred stock and $30 million in senior secured notes, in addition to the $70 million of existing senior secured notes. Lehman and Colchester began the offering in May 2005 on behalf of Radnor.

51.    Based on the recommendations of Lehman, Merrill Lynch and Colchester, Kennedy began preparing the European operations for sale or merger with other industry participants and developed an offering memorandum for a private placement of nonvoting preferred shares and additional notes which were identical to the publicly traded bonds which Radnor had issued and outstanding. It was determined that Lehman would prepare the offering memorandum for the sale of the European chemical business as Lehman had previously marketed the European operations.

52.    Kennedy had significant experience with taking a company public, in corporate

governance as well as in mergers and acquisitions.  Radnor had not sold any shares to third parties in its 15 year history and Radnor was 100 percent owned by Kennedy, his family and management.[24]  Kennedy knew it was important to find the appropriate partner to assist Radnor with its planned growth and work well with its board and management.  Kennedy also believed that an institutional investor would benefit from its ownership in Radnor and upon conversion of the preferred shares. would then own shares in a publicly traded Radnor.  Kennedy and Lehman commenced the offering in June 2005.[25]

53.     Separately, Kennedy met with an ad hoc committee of bondholders of Radnor with Colchester,  at their offices in August 2005 and at the New York offices of Skadden in December 2005 to facilitate the negotiations and had brief meetings with Greg Milmo and Pat Moran ("**Moran**") of Skadden regarding the exchange offer.  Skadden, although not retained, was considering assisting in the exchange offer and facilitated discussions by holding meetings in the Skadden offices with the unsecured bondholders.

54.     The exchange of the unsecured bonds for equity in Radnor would reduce interest costs by fifty percent or $15 million dollars annually and increase the float or market value of the outstanding and tradable shares in Radnor's common stock as part of its initial public offering.  In order to facilitate the debt for equity exchange and the private placement, Kennedy and the Radnor board engaged Colchester, who attended the various meetings with the unsecured bondholders.   Colchester was a trusted adviser to Radnor as its managing principal was a former board member of Radnor and investment banker to Radnor and Kennedy involving the offering of its secured and unsecured bonds.

55.     In addition, Kennedy had discussions with other industry participants Nova Chemicals and Sterling Chemicals regarding combination of their respective chemical operations in order to separate

---

[24] *See Exhibit 14-*  Shareholders schedule of ownership of Radnor.

[25] *See Exhibit 13(a)* - Lehman offering memorandum dated June 2005.

Radnor's chemical operations from its rapidly growing packaging manufacturing businesses. Kennedy also continued his discussions with the unsecured bondholders to complete the equity for debt exchange, a sale of the European chemical operations and other asset sales.

56.     In July 2005, Lehman recommended a West Coast trip to visit with potential private equity investors in Los Angeles and San Francisco, California.  On August 18, 2005, Kennedy met with Feliciano and Steve Chang ("**Chang**") of Tennenbaum Capital in their offices in Santa Monica, California.  Feliciano and Chang expressed serious interest in Radnor's business and its growth prospects.  Feliciano and Chang advised Kennedy that they had a minimum investment size of $50 million and could do up to $75 million in equity.  Feliciano demonstrated his knowledge of the chemical and packaging industry and appeared to be a good fit with Kennedy, Radnor and its management team. Tennenbaum was unknown to Kennedy and was introduced to Kennedy by Lehman as an institutional private equity firm and not as a hedge fund.

57.     At no time during the meeting with Feliciano and Chang, did the Tennenbaum partners or Lehman disclose that Tennenbaum was a major client of Lehman and had assisted in raising the funds which would eventually invest in Radnor.

58.     In late August 2005, Tennenbaum expressed an interest in investing in Radnor and began negotiating terms with Radnor management as well as commencing a due diligence review of Radnor's financial statements, its prospects for an initial public offering and examining the anticipated launch of the new products with McDonalds.

59.     Further, at the time Radnor engaged Lehman, Radnor was unaware that Tennenbaum had a pre-existing relationship with Lehman through which Lehman had the exclusive right to market the preferred shares of the Tennenbaum Funds beginning in July 2004 and continuing through October 2005

and was paid $3.75 million in placement fees.[26]

60.    Unbeknownst to Kennedy, Tennenbaum was a large, sophisticated private hedge fund specializing in "active control" and distressed investments in publicly traded and private securities of both debt and equity instruments across a broad range of industries.[27]

61.    According to Tennenbaum's offering memoranda and presentation materials, Tennenbaum provided investors, Tennenbaum would typically take "fulcrum" positions in the capital structure of companies and through contracts and/or lending arrangements, attempt to extract value and gain control through changes in corporate governance and/or restructuring the target company's capital structure and operations to enhance the return on its investment.[28]

62.    In fact, Tennenbaum is an "event driven" activist hedge fund which invests in various forms of debt or mezzanine capital at high rates of return, replaces management and/or influences the governance of the companies in which it invests in lieu of outright control.[29]    Tennenbaum typically seeks to change management and seize control of the companies which they target.[30]

63.    In order to find companies in which to invest, Tennenbaum needed to keep secret its real intentions to influence and control its targets.    Therefore, Tennenbaum only discussed its true investment strategies with its investor clients.[31]    In stark contrast, Tennenbaum's web site and marketing materials positioned Tennenbaum as a private equity investor which assisted companies with complex financing or

---

[26] *See Exhibit 9(A), Exhibit 9(B) and Exhibit 9(C)* - certified financial statements of Tennenbaum Funds for 2004 and 2005 filed with the SEC.

[27] *See Exhibit 3(C)* – Tennenbaum 17(d) filing with Securities and Exchange Commission describing Tennenbaum Funds, control by Tennenbaum Capital and control investment strategies.

[28] *See Exhibit 17* - Tennenbaum presentation dated May 2008 demonstrating methods and practices utilized to extract value from its typical investments.

[29] *See Exhibit 3(C)*- Tennenbaum SEC filings outlining its funds and strategies.

[30] *See Exhibit 3(A) and Exhibit 3(B)* - Tennenbaum Fund offering memoranda for a description of their investment strategy.

16

assisted them with their growth plans. Tennenbaum's pattern of deceit would ultimately continue until Kennedy uncovered the facts set forth herein.

64.     Kennedy met personally with Michael Tennenbaum, Holdsworth and Lefkowitz, the senior managing partners of Tennenbaum, shortly before closing of the preferred share investment in their Santa Monica, California offices in September 2005. At no time during the meeting with the senior Tennenbaum partners was it disclosed that Lehman, then representing Radnor was conflicted in its representation due to its close relationship with Tennenbaum or that Tennenbaum had a material connection or relationship with Silver Point Capital LLC ("**Silver Point**"), a Greenwich, CT based hedge fund and the majority holder of Radnor's $70 million in outstanding secured bonds. During the meeting, Michael E. Tennenbaum proffered that he personally looked forward to partnering with Kennedy and assisting Radnor in its growth plans as well as building on its relationship with McDonalds and the new proprietary products.

65.     Thereafter, Hurricane Katrina and Hurricane Rita hit the Gulf of Mexico, severely impacting the delivery of raw materials necessary in Radnor's business, the availability of energy sources and shipments throughout the United States.

66.     In late September 2005, despite the knowledge of the hurricanes and their impact, Tennenbaum made its initial investment in Radnor, a $25 million purchase of non-voting preferred stock. In connection with the investment in preferred stock, Tennenbaum also signed an investors rights agreement which provided numerous protective provisions favoring Tennenbaum, such as the restriction on further borrowings and sale of additional equity.

67.     The additional secured notes would require the consent of the existing bondholders (Silver Point) and Lehman engaged its liability management group to obtain the required consents.    Lehman

---

[31] *See Exhibit 3(A) and Exhibit 3(B)* – Tennenbaum Fund offering memoranda for a description of their investment strategy.

indicated that it thought that a small consent fee would all that would be required.  In addition to the preferred stock, Tennenbaum issued warrants for Radnor shares based upon various earnings levels and an investor rights agreement providing Tennenbaum with certain protective provisions.

68.     After many weeks of efforts by Lehman's team having calls between Lehman, Radnor and Silver Point, it became abundantly clear that Silver Point, who owned a majority of the secured notes would not consent to the newly issued notes to Tennenbaum (despite the material and undisclosed connections with Michael E. Tennenbaum which we would learn later).

69.     In December 2005, Tennenbaum proposed that Radnor repurchase the $70 million in outstanding secured bonds by utilizing its call provisions under the notes and issue $95 million in newly issued secured notes to Tennenbaum, in effect becoming Radnor's largest secured creditor.   The recommendation came as a surprise to Kennedy that Tennenbaum would purchase such a large interest in its secured notes.  However, given the launch of the McDonalds products were underway and Silver Point was refusing to consent, the Radnor board approved the repurchase of the $70 million secured notes at 103 precent of par value and the issuance of the $95 million new bonds to Tennenbaum.

70.     On December 30, 2005, Radnor acquired the $70 million in secured notes from Silver Point Partners, L.P.  Radnor, in effect, paid a fifteen percent premium or approximately $9.1 million over the market price to Silver Point for its control position in the secured notes.  Radnor, in turn, issued $95 million in identical notes to Tennenbaum.

71.     Unbeknownst to Kennedy and the Radnor board, Tennenbaum had a previous, but undisclosed relationship with Silver Point.  Defendants Tennenbaum and Holdsworth of Tennenbaum Capital shared board seats and an investment in Party City Corporation and had assisted Edward Mule of Silver Point in the formation of his Silver Point funds by providing legal documents from Tennenbaum for the offering of the Silver Point funds.  It is not known without further discovery, whether the material

and adverse connections with Silver Point to Tennenbaum was a factor in the inability to gain the required consents from Silver Point.

72.     Later, Silver Point would enter the Radnor transactions again by providing debtor in possession financing and thereby assisting Tennenbaum in its efforts to hasten the sale process to the detriment of Kennedy and other parties in interest.  Silver Point was also a client of Skadden.

73.     The impact of the hurricanes caused a severe reduction in production capability at numerous Radnor manufacturing plants due to shortages of natural gas and raw materials as well as a dramatic spike in prices for the commodities, and caused an a loss estimated to be $30 million in October through December of 2005 period.  As a result, Radnor was forced to draw on its its credit facilities during the first quarter of 2006.

74.     The combination of the build out of the products for McDonalds and the impact of the hurricanes had created temporary liquidity pressure on Radnor's revolving credit facility and resulting overdrafts on its line of credit.  In April 2006, Tennenbaum began to have discussions with Radnor's bank group.  Kennedy was not present for the meetings or discussions but was concerned as the banks were not complimentary of Tennenbaum's increasingly hostile attitude toward the banks, particularly given Tennenbaum's position as Radnor's largest secured lender.

75.     As a consequence several of the banks, which were new to Radnor's bank facility, took a very conservative position regarding inventory and receivables of Radnor, which were unprecedented in Radnor's history as the banks were not willing to advance funds against the excess inventory reserved for McDonalds despite the written contracts, due to the severe financial impact of the hurricanes.[32]

76.     In March 2006, as a result of the McDonalds launch and the losses related to the prolonged impact of the hurricanes on raw material and energy prices, Radnor needed additional capital

---

[32] The impact of the changes to Radnor's borrowing facility in effect reduced its borrowing levels by in excess of $10 million as compared to previous methodologies Radnor utilized for nearly 10 years.

19

for liquidity and the bank group was unwilling to advance any further funds under its working capital facility.

77.     In order to satisfy the working capital needs of Radnor, Tennenbaum agreed to advance $23.5 million in additional notes and Kennedy invested $1 million and guaranteed $10 million of Tennenbaum's loans. Tennenbaum initially requested Kennedy pledge his all of his shares in Radnor. Kennedy refused and agreed to a partial and limited guaranty with the caveat that the loans have a priority of prepayment clause in the event of the sale of any assets.[33]   Tennenbaum also required as a condition of the financing for Kennedy to seek additional operating assistance, hire a COO or engage a firm to assist Kennedy as COO.   Kennedy and the Radnor board agreed determining that Radnor could use additional operating management support as well as assist Kennedy with Radnor's many projects.

78.     In May 2006, Kennedy met with several financial advisory firms and decided upon Springel of A&M who had significant operating experience.   A&M was engaged by Kennedy and the Radnor board to assist the Radnor board and Kennedy in developing a restructuring or refinancing plan.

79.     Undisclosed to Kennedy were the facts that Feliciano had contacted Springel in advance of the meeting with Kennedy, Hollander of Tennenbaum had contacted the New York offices of A&M, and Michael Tennenbaum was very good friends with Tony Alverez, a founder of A&M who operated out of the Los Angeles offices of A&M.   None of these contacts or calls were disclosed to Kennedy or the Radnor board.

80.     Kennedy and the Radnor board also began discussions with law firms to handle the restructuring of the bonds and sale of the European business.   The Radnor board interviewed numerous firms and Tennenbaum recommended several firms as well.   Given Kennedy's prior experience with

---

[33] Kennedy was unaware that in the documentation to the $23.5 million advance from Tennenbaum, Tennenbaum had invalidated the priority of payment clause by a provision in the intercreditor agreement in the event that acceleration occurred under the notes.

Skadden and Duane Morris over the past ten years, Kennedy felt confident that both firms could have handled the restructuring and the sale of the European operations.

81.     The Radnor board was concerned that it needed a large firm to handle the sale of the European business and restructuring; and had used the Skadden firm for most of its more complicated matters.  On the other hand, Duane Morris was a trusted adviser for nearly 20 years, but had a smaller restructuring and securities practice.  Tennenbaum recommend numerous smaller firms even firms smaller than Duane Morris.

82.     In May 2006, Kennedy and his general counsel contacted Edward Welch who ran the Wilmington office of Skadden and discussed Radnor's needs for a possible restructuring and its discussions with the unsecured bondholders.  Welch recommended Mark Chehi of the Delaware office and Peter Nettles from New York who would be able to handle the matters and was available to meet with Kennedy as soon as possible.  Kennedy trusted Welch's judgment and notified the Radnor board, including Tennenbaum, of his conversations with Welch.

83.     Kennedy set up a meeting with Chehi and his general counsel for the following week. Feliciano, in response to Kennedy notifying him of the meeting, asked that Radnor continue to interview other law firms and made it clear that he was not in favor of Duane Morris.  Feliciano then requested that Tennenbaum's general counsel, Hollander, participate in the meeting between Chehi and Kennedy via telephone.

84.     The meeting between Kennedy and Chehi went smoothly and both Kennedy and his general counsel were impressed with the fact that Chehi had just finished the restructuring of Birch Telecom.  Chehi forwarded Skadden billing records as well as a personal recommendation from the Birch CEO thanking Chehi for his efforts.

85.     Feliciano advised Kennedy in an email that Tennenbaum would not approve of Chehi's

21

involvement under any circumstances and Radnor should interview other firms and another restructuring team within Skadden.  Kennedy requested an explanation for Tennenbaum's refusal to approve of Chehi but never received an explanation.  At no time did Feliciano, a board member and partner at Tennenbaum or any of the partners of Skadden firm involved in the retention disclose that Tennenbaum was a major client of the Skadden firm and Skadden was lead counsel in raising the funds invested by Tennenbaum in Radnor.

86.    In a follow up teleconference call with Feliciano, Kennedy was informed that Tennenbaum outside counsel Greg Bray from Milbank Tweed ("**Milbank**") recommended against Chehi and strongly recommended Skadden attorney Galardi.  In fact, Bray from Milbank had represented creditors in the Birch Telecom restructuring and had negotiated against Chehi.

87.    Kennedy contacted Welch at Skadden and inquired as to why Tennenbaum was refusing to approve the counsel that was recommended by Welch.  Welch responded that there was no reason that he was aware of for Tennenbaum's refusal to approve Chehi and that both attorneys were competent to handle the Radnor restructuring.

88.    Based upon his discussion with Welch, Kennedy agreed to meet with Galardi and Tim Pohl from Skadden's Chicago office.  The meetings with Galardi and Pohl were uneventful and the Radnor board felt more comfortable with the Skadden firm given their resources in handling complex matters and prior experience over a decade with Radnor. Later, the trust and loyalty expected by Kennedy and the Radnor board based upon their long history and relationship as a client of the Skadden firm would later be proved unfounded and a false as well as costly assumption.

89.    Via email, Kennedy received unanimous approval from the Radnor board on the engagement of Skadden to handle the Radnor restructuring as well as from the Tennenbaum representative Feliciano.  Again, at no time did Feliciano, a board member and partner at Tennenbaum or

any of the partners of Skadden firm involved in the retention disclose that Tennenbaum was a major client of the Skadden firm and Skadden was lead counsel in raising the funds invested by Tennenbaum in Radnor, nor the fact that Skadden partners were investors in the Tennenbaum funds.

90.    Kennedy was notified by his in house counsel that Skadden via a call from Moran at Skadden, that Skadden needed a waiver from Tennenbaum in order to proceed with the engagement due to small tax matters as Tennenbaum was a former client.   Given, Kennedy's past experience with Skadden on conflict matters, Kennedy was concerned and sought assurance from both Skadden and Tennenbaum that the conflicts were not a problem, particularly given the importance of this engagement.

91.    In a May 2006 email from Kennedy to Tennenbaum, Kennedy had expressed his understanding that "Skadden has represented [Tennenbaum] in other unrelated matters in the past and Skadden does not consider them a conflict."  Kennedy's comfort with Skadden was erroneously founded upon inaccurate and seriously limited information that would only be uncovered years later after Kennedy's meticulous review of the voluminous evidence in this case.

92.    Feliciano stated that Tennenbaum would approve of the Skadden representation and would agree to a waiver letter with the Skadden firm. Nearly two weeks passed and no waiver letter was executed.  Kennedy asked his counsel to see what the delay was as valuable time was passing and Radnor needed clarity as to who would be representing Radnor in these matters.   Skadden attorney Moran explained that discussions were continuing with Tennenbaum and the waiver would be forth coming.

93.    Kennedy was informed in the following week that the waiver was executed and that Moran would send the engagement letter to Kennedy.

94.    At no time did Skadden or Tennenbaum disclose that there existed more connections or conflicts than small tax matters between Skadden and Tennenbaum.  Kennedy never received a copy of the waiver, but the engagement letter was executed June 5, 2006 (the "**Engagement Letter**") and Skadden was retained by Radnor as lead restructuring counsel on the terms and conditions set forth in the

Engagement Letter.

95.     The Engagement Letter as drafted by Skadden contained several carefully constructed waivers and releases, all in an effort to insulate Skadden and Tennenbaum from liability if, and when, the extent of their manipulation, deception and fraud was discovered.

96.     Later, before the Bankruptcy Court, Galardi would refer falsely to the delivery of a "full waiver" despite a provision in the Engagement Letter protecting Skadden from a breach of fiduciary duty claim by Radnor.  In the Engagement Letter, only the Tennenbaum Funds were listed as potentially adverse parties, not Tennenbaum & Co or Tennenbaum Capital.  This would later prove to be a clear attempt to shield the Tennenbaum Parties from liability.

97.     In fact, the Radnor Board and Kennedy were steered throughout the entire retention process by Skadden and Tennenbaum. There would appear on the record numerous acts of manipulation and misrepresentations or omissions of material facts which would demonstrate a clear pattern of deceit by the Defendants.

98.     A true and correct copy of a series of email correspondences between Jose Feliciano, partner of Tennenbaum and Mr. Kennedy on May 30, 2006 demonstrating the manipulation of the Radnor board by Tennenbaum is incorporated herein by reference. Feliciano demanded Skadden's representation of the Debtor and voted in favor of the Skadden and Lehman retentions in this case, despite actual knowledge of the serious and extensive conflicts both professionals held.

99.     Numerous advisers to Radnor acknowledged in testimony in Bankruptcy Court or in their individual depositions to receiving calls from the Tennenbaum Parties in advance of their retention interviews. Despite these advisers' contacts, material connections to Tennenbaum, none of the parties disclosed these material contacts and connections to Radnor or Kennedy.

24

100.    The required Form 2014(b) Statement filed with the Bankruptcy Court and signed by Galardi on behalf of Skadden fails to disclose the true nature and extent of the conflicts Skadden had with respect to Tennenbaum in its representation of Radnor in the Bankruptcy Case.

101.    During a September 20, 2006 hearing before the Bankruptcy Court, Galardi represented that no conflict existed between Skadden and Tennenbaum and the work performed was for 5 hours of tax work related to the investment in the Debtor and was thus *de minimus* under a test established by the Bankruptcy Court when determining whether conflicts exist in situations involving large firms with numerous clients.   Galardi had manipulated the test established by the Court and intentionally omitted from his disclosure to the Court, the $3.1 million paid to Skadden by Tennenbaum in 2004 as well as the continuing legal fees paid in 2005 and 2006 which were material conflicts hidden from the Court, Kennedy, the Radnor board and the U.S. Trustee.

102.    When asked by the Bankruptcy Court if the Tennenbaum conflicts were disclosed, Galardi answered affirmatively and represented that the work was reviewed by Skadden attorney, Attorney Meehan. *See* Transcript of September 20, 2006 hearing, p15 – 18.

103.    From the September 20 Transcript[34], it is clear that the Bankruptcy Court was becoming increasingly concerned as to the significant amount of conflicts beginning to appear on the record through depositions and testimony.   *See* September 20 Transcript, p 56-57.   Despite numerous opportunities to disclose the conflicts and withdraw from representation, Skadden continued to make misrepresentations to the Bankruptcy Court and hide the known material conflicts in order to continue to assist Tennenbaum in its scheme to acquire the consolidated assets of Radnor in a hastened sale process and avoid reorganization.   *See* September 20 Transcript, p 31 – 33.

---

[34] *See Exhibit 2* - September 20 Transcript.

104.    During a hearing before the Bankruptcy Court on October 27, 2006, Galardi described, in small part, Skadden's conflicts due to its relationship with Tennenbaum which alarmed the United States Trustee but did not invoke an investigation of Skadden's billing records.  The transcript of the October 27, 2006 hearing (the "**October 26 Transcript**")[35] [Docket No. 582] is incorporated herein by reference. Pages 46 – 50 of the October 26 Transcript are the relevant pages.

105.    At the inquiry of the Bankruptcy Court, Galardi described the SK Fund, the investment partnership by Skadden partners and employees in the Tennenbaum Funds as "blind trusts."  In stark contrast, Skadden's May 3, 2012 Form 17(d) filing revealed that Skadden partners actually owned and controlled the SK Fund and other private funds of the Skadden partners and employees.

106.    Kennedy and the Radnor board continued to engage advisers to Radnor, in order to facilitate the restructuring and sale of the European business.  These engagements were discussed at length in Radnor board meetings and with Skadden and Tennenbaum, all the while the true conflicts and material relationships and the manipulation by Tennenbaum and Skadden were undisclosed to Kennedy and hidden from the Radnor board.  Further, none of the material conflicts between Skadden and Tennenbaum, appearing in the recording and in sworn testimony before the Court, where ever disclosed to Kennedy and the Radnor board by Galardi.

107.    Kennedy executed an engagement letter on behalf of Radnor with Lehman in June 2006 and began further discussions with numerous parties to restructure Radnor, including the sale of the European operations, North Carolina plastics business and an additional equity investment combined with the merger of Radnor's chemical operations in both Europe and North America with other competitors, thus separating the chemical operations from the packaging business as Lehman had recommended.

---

[35] *See Exhibit 20* – October 26 Transcript

26

108.   In discussions with Lehman's chemical group, Kennedy was notified that the European business was too small of a transaction for Lehman to handle in a sale.  Kennedy contacted the London office of Lehman to see who they would recommend, but received no guidance as to who would handle sale efforts.

109.   Lehman, in a presentation to Kennedy and the Radnor board, including Feliciano, noted that a sale of the plastic business together with an equity infusion was the best alternatives for the restructuring.  Kennedy asked the Lehman team to move quickly to contact strategic buyers for the sale of the plastics business.  Unbeknownst to Kennedy, Lehman failed to disclose that Tennenbaum was a major client of Lehman and Joe Spano, the Los Angeles investment banker from Lehman who handled the Tennenbaum relationship was on the Radnor restructuring team..

110.   In addition, Tennenbaum was having numerous calls and meetings with the numerous advisers, banks and potential investors in Radnor.  At no time, was the Radnor board notified by Tennenbaum, Lehman or Skadden of any prior dealings with Tennenbaum or the numerous calls or meetings taking place which were clear efforts to influence or intimidate the advisers and acted to undermine Kennedy's efforts to refinance and restructure Radnor.

111.   Kennedy had numerous calls with the unsecured bond holders led by the Airlie Group ("**Airlie**"), Deutche Bank and Barclays all of whom Kennedy knew for nearly ten years, since their original investment in the Radnor bonds.

112.    Skadden, Tennenbaum and Lehman clearly knew of these various meetings to restructure Radnor and the extent of the discussions and negotiations.  Lehman was kept apprised of the progress by Kennedy via email.

113.   By June 2006, the unsecured bondholders were beginning to get concerned regarding Tennenbaum's intentions for Radnor and requested a meeting in Tennenbaum's Los Angeles offices.

Kennedy was notified of the meeting to take place in July 2006 and was told by both Feliciano and Airlie that the meeting was uneventful and no commitments or assurances from Tennenbaum were forth coming.

114.    During the retention interview with Lehman and presentation to the Radnor board, Mark Shapiro and Mike Palm, Radnor's long term investment banker provided a detailed presentation and given Lehman's assistance in preparation for Radnor's IPO and previous experience marketing the European business, provided Kennedy and the Radnor board that Radnor had the correct combination of both legal and financial advisers to complete the restructuring and reducing Radnor's debt incurred to launch the McDonalds products and the recent costs related to the impact of the hurricanes.

115.    Unbeknownst to Kennedy, Feliciano, who had attended the interview of Mark Shapiro of Lehman by Kennedy in Radnor's offices, had contacted Shapiro and Joseph Spano of Lehman the night before the meeting.  Neither Feliciano nor Shapiro mentioned or otherwise disclosed the advance call when Kennedy interviewed Shapiro the following day and introduced Feliciano to Shapiro at the meeting.  Hollander also listened in to the meeting from Tennenbaum's Los Angeles, California office. Kennedy and the Radnor board also asked Shapiro of any conflicts regarding Lehman's representation of Radnor and the restructuring.  Shapiro assured Kennedy and the Radnor board that Lehman could quickly assemble the team, had years of experience with Radnor as well as handled the recent investment by Tennenbaum.

116.    Kennedy had assumed incorrectly that Skadden and Lehman would assist Radnor in completing the refinancing and asset sale transactions given that both Skadden and Lehman were long term advisers to Radnor.  Tennenbaum, Lehman and Skadden never disclosed the true relationships with Tennenbaum despite numerous opportunities as well as questioning by Kennedy and the Radnor board.

117.    In fact, Tennenbaum had been all along contacting Lehman, Skadden and other potential

advisers to Radnor in advance of meetings with the Radnor board and Kennedy. Similar to the discussions Tennenbaum held with the banks, without Kennedys or the Radnor board's knowledge, Tennenbaum was attempting to influence the advisers to Kennedy and the Radnor board. Evidence of these contacts is replete through the record of the bankruptcy case and various depositions of the advisers.

118.    Kennedy and Radnor engaged Lehman as restructuring adviser along with Skadden to assist in refinancing, debt for equity exchange and restructuring.  Kennedy and the Radnor board were actively engaged with the Radnor unsecured bondholders.

119.    As a result of its initial equity investment, Tennenbaum was a board member of Radnor and voted in favor of both the retention of Lehman and Skadden as advisers to Kennedy and the Radnor board without ever disclosing its deep relationships with both Lehman, Skadden, A&M or Silver Point.

120.    Immediately upon the engagement of Galardi, matters became difficult for Kennedy and Radnor.  Galardi spent an extensive amount of time on calls with both Springel and Feliciano as well as Tennenbaum's counsel at Milbank Tweed and began notifying the Radnor board and in house counsel of the appearance of conflicts between the Radnor board and Kennedy due to Kennedy's guaranty of the Tennenbaum indebtedness.  Galardi advised that there existed many conflicts between Kennedy and the Radnor board and that the Radnor board needed to be careful to avoid any appearances of entrenchment or impropriety in the event the restructuring was unsuccessful to insulate the directors from litigation by the unsecured creditors and possibly by Radnor itself in a derivative action by creditors.  In light of Galardi's comments, Kennedy's concerns and the concerns of the Radnor board, Kennedy discussed the surfacing issues with Duane Morris and Patricia Moran at Skadden.

121.    Galardi recommended the appointment of independent counsel to guide the Radnor board in its dealing of conflicts and recommended that Finigan the only non-employee board member of

Radnor discuss the role of independent committee of the board with attorney Moran at Skadden in New York. Finigan began to have calls directly with Moran regarding the possibility of assuming that role on Radnor's board.

122.    Unbeknownst to Kennedy and the Radnor board, Hollander, Tennenbaum's general counsel, had negotiated the waiver with Skadden and was having numerous conversations with Prins at Skadden regarding the waiver as well as the investment in Radnor and had a tacit agreement to have independent counsel litigate any claims against Tennenbaum, thus Skadden would avoid litigating claims against Tennenbaum.

123.    Moran and Galardi conveniently recommended that due to the conflicts between the Radnor board members who were employees, Kennedy's guaranty and Kennedy's employment contract, Finigan should vote on any conflicts and hire independent counsel as the special committee of the Radnor board. In July 2006, as recommended by Skadden, Finigan reached an agreement with the Radnor board as to Finigan's role as the special committee of the board and reimbursement of expenses and an independent director's fees for his time and expenses. Thus, Skadden established the process and fulfilled the agreement between Prins and Hollander to avoid Skadden bringing direct claims against Tennenbaum and kept hidden the material conflicts which existed with Radnor's own counsel.

124.    At no time was Kennedy or the Radnor board told of the material conflicts of Skadden regarding Tennenbaum, ongoing relationships regarding the Tennenbaum Funds, ongoing representation by Prins regarding the formation or the fees paid to Skadden of $3.1 million in 2004 or the hundreds of thousands of dollars paid by Tennenbaum and the Tennenbaum Funds for investment advisory, SEC or governance legal advice by Skadden in 2005 and 2006. Tennenbaum and Skadden also failed to disclose the connections and conflicts with Lehman, who participated in raising the Tennenbaum Funds, A&M, Silver Point or Morgan Stanley which all had material and undisclosed connections and conflicts with

Tennenbaum.

125.    Further, Skadden partners were investors in the Tennenbaum Funds and had assisted in the formation and marketing of the Tennenbaum Funds with Lehman and Morgan Stanley only 18 months earlier.  Unbeknownst to Kennedy and the Radnor board, Prins and other Skadden partners had invested in the Tennenbaum Funds via an entity owned and controlled by Skadden partners to invest alongside clients' funds, presumably hedge funds, which pooled the Skadden partner's funds.  The Skadden entities had an exemption from the SEC from registration under the Investment Advisers Act due to the fact that investments were made and controlled by the Skadden partners, no independent advisers were involved and only Skadden partners and employees were permitted to invest.  This material conflict was never disclosed to the Radnor board or Kennedy throughout the engagement of Skadden and was never discussed by Galardi or Moran during the later litigation with the unsecured bondholders or the independent committee of Radnor which was established to insulate the entire process from investigation and protect Tennenbaum's interests.

126.    In fact, both Lehman and Skadden had assisted in raising the Tennenbaum Funds and were on the documents sent to investors.  Tennenbaum clearly knew of these material conflicts, yet voted in favor of the retention of Skadden, Lehman and A&M.  Obviously, Tennenbaum intended to keep its influence on the advisers to Kennedy and the Radnor board a secret.

127.    In the coming months, Kennedy received very little support from Lehman, Skadden or A&M.  Galardi, Feliciano and Springel spent more of their time on calls and preparing for litigation with the unsecured bondholders.

128.    Kennedy complained to the Radnor board, his in house counsel, Galardi and his own counsel to no avail, no resources would be forth coming and Springel insisted that he needed the financial team of Radnor to manage the cash flow and financial statement projections required by Tennenbaum.

129.    Tennenbaum requested increasingly more financial information and unknown to Kennedy, Tennenbaum had engaged Amit Patel of Houlihan Lokey to advise Tennenbaum on its strategy with the Kennedy, Tennenbaum had retained Amit Patel of Houlihan Lokey to advise Tennenbaum on how to orchestrate a purchase Radnor and its strategy against the unsecured bondholders.  Kennedy had previously, interviewed Patel as a potential financial adviser to Radnor, but favored Lehman.  At no time had Feliciano or Tennenbaum discuss that Houlihan and Patel were working with Tennenbaum as early as March of 2006.[36]

130.    Tennenbaum, Skadden and Springel were becoming increasing antagonistic of the unsecured bondholders and the Radnor bank group.

131.    Galardi and Springel both stated that there would not be enough time to complete a restructuring, sell asset or refinance. Galardi denied Kennedy resources; undermined Kennedy's conversations with both Lehman, as well as other advisers and Springel spent virtually no time in supporting Kennedy's efforts at completing a sale of assets or restructuring and spent all of his time with Feliciano and Galardi in preparation for bankruptcy filing.

132.    Finally, Galardi announced that Radnor was running out of time and Tennenbaum was impatient regarding Kennedy's restructuring efforts.  Lehman advised Galardi that its attempts to find purchasers for the plastic operations or investors in the packaging business were not successful. According to Lehman and Galardi, investors were either not interested or it would take too much time and Tennenbaum and Radnor's banks were losing confidence in Kennedy's ability to run Radnor and due to his alleged conflicts.  Galardi stated that Kennedy was wasting valuable time. Galardi informed the Radnor board that a backup plan was necessary to protect the Radnor board from litigation by unsecured

---

[36] *See* excerpts of video and transcripts of Patel, Feliciano and Springel presentation in 2009 in Las Vegas, Nevada distressed debt conference describing playbook of Tennenbaum and Houlihan Lokey regarding benefits of 363 sale strategy regarding the Radnor acquisition and litigation with the unsecured bondholders.

creditors that outweighed any duty to equity holders and that the Radnor board needed to prepare for the unfortunate outcome of an imminent Radnor bankruptcy filing.

133.    Galardi recommended that in order to have an orderly bankruptcy plan, Radnor needed a "stalking horse" bidder or investor to create a floor for a value for Radnor's assets or businesses. Kennedy discussed at length with board members his optimism at the potential sale or restructuring of Radnor, but agreed based upon Galardi's advice, that a backup was indeed important to the Radnor board.

134.    In July of 2006, based on Galardi's advice, the continued over advance with its line of credit and pressure from both Tennenbaum and the bank group, Radnor began to prepare for filing of a bankruptcy petition under Chapter 11 of the Bankruptcy Code.  The Radnor board authorized Kennedy to work on the restructuring plans in addition to Skadden submitting a bankruptcy plan in event Kennedy failed in his attempts to restructure Radnor.

135.    Galardi recommended that the Radnor board approve commencement of negotiations with Tennenbaum regarding a stalking horse position and terms of a purchase agreement.

136.    Skadden also recommended that Kennedy seek his own counsel due to his conflicts as Radnor's largest equity holder and guarantor of Radnor's obligations to Tennenbaum.  Attorney Moran recommended several firms in New York which were known to Skadden and had experience in representing CEO's in such complex matters.  Moran stated that independent counsel for Kennedy was necessary to avoid mistakes that could expose Kennedy to litigation in the event Kennedy was unsuccessful in restructuring Radnor.

137.    Kennedy received a short list of counsel referred by Skadden and engaged Stuart Friedman ("**Friedman**") of Friedman Wittenstein LLP as his personal counsel.  Friedman was close to Skadden and discussed the status of Radnor with Moran, Galardi and Shapiro.  Friedman recommended

that Kennedy be very careful regarding Tennenbaum and his guaranty, stay close to Skadden, and hope for the best, but plan for the worst.  Friedman assured Kennedy that Skadden would help protect Kennedy.

138.    Kennedy complained on numerous occasions to Friedman that Galardi was undermining his efforts at a sale or restructuring of Radnor and asked Freidman to inquire as to why Kennedy was not provided resources by Skadden or Lehman.  Friedman disclosed to Kennedy that Galardi considered Kennedy's efforts at restructuring Radnor were hopeless, that Tennenbaum would end up purchasing Radnor and there was not enough time for Kennedy to accomplish his objective of restructuring Radnor. Galardi also insisted that both Lehman and Skadden viewed Kennedy's plan as a hopeless endeavor due to Kennedy's alleged conflicted intentions and lack of time to complete a transaction.  In fact, Galardi warned Kennedy that the unsecured bondholders were "playing him" and were not to be trusted.

139.    Kennedy was furious at Galardi for making wild assumptions regarding the outcome of Kennedy's restructuring efforts. Galardi continued his characterization of any discussions with the unsecured bondholders as worthless, completely disregarded the value of the European operations, the past success and growth of the packaging business and Radnor's improving cash flow projections once energy and raw material prices normalized.

140.    Friedman informed Kennedy that it was not personal, but Galardi insisted that Kennedy's equity was out of the money and Tennenbaum's secured creditor position had priority and would indeed protect Tennenbaum's interest.  Friedman assured Kennedy that he would speak with Moran about getting some support for Kennedy in his restructuring efforts.  In the meantime, Friedman advised Kennedy to allow Galardi to do his work, refrain from voting on any matters, stay clear of conflicts and hope that Tennenbaum would not sue Kennedy over Kennedy's guaranty of the Tennenbaum obligations.

141.    Kennedy heeded Friedman's advice and continued his efforts at a restructuring, keeping

34

Tennenbaum and Skadden advised of his efforts at a consensual debt for equity exchange with the unsecured bondholders and sale of the European operations.

142.    Kennedy also had numerous calls with both Lehman and Skadden and the bondholders. Kennedy also met with other equity investors regarding a consensual restructuring with the unsecured bondholders, recapitalization of Radnor's businesses, sales of various divisions and direct equity infusions.  Lehman, Tennenbaum, Skadden and A&M gave Kennedy little if no support and spent most of their time preparing for bankruptcy filing as directed by Skadden, the Radnor independent committee and Radnor's board all at the direction of Skadden.

143.    Kennedy was frustrated by the lack of support by Radnor's advisers and infuriated at the fees, costs and individual concerns of the advisers regarding fee schedules and payments to the advisers and the "fate d compli" attitude of Galardi and Lehman.

144.    Galardi, Springel and Paul Ridder, Radnor's CFO, negotiated the stalking horse agreement with Tennenbaum.  Kennedy abstained based on his counsel's advice.  The Radnor board, without Kennedy's input, agreed to the terms of the stalking horse agreement with Tennenbaum proposed by Galardi, Springel and Lehman.  Essentially, the sale terms, bid procedures, the sale agreement and indeed the entire sale process with Tennenbaum was negotiated by Galardi, Springel and Lehman.  At no time, were any concerns regarding any conflicts, overreaching by Tennenbaum or potential claims against Tennenbaum discussed or disclosed with the Radnor board or Kennedy.

145.    Galardi began to vilify the unsecured bond holders.  Galardi informed Friedman that Kennedy was wasting his time, the unsecured bondholders were playing him, litigation was imminent and Kennedy would become entangled in the litigation.  Galardi claimed Kennedy was attempting to entrench himself and that Radnor's management, including Kennedy, was hopelessly conflicted.[37]

---

[37] *See Exhibit 21*- emails from Friedman regarding calls with Galardi and Skadden concerning lack of support for restructuring efforts by Kennedy.

146.    Kennedy was at loss as to why the advisers who he had engaged to assist Radnor in a restructuring or sale of assets were unwilling to support Kennedy's restructuring efforts.  Without explanation, Galardi insisted on pursuing a Section 363 bankruptcy sale process and unilaterally stated that a restructuring was not possible given the time and liquidity needs of Radnor.  Galardi constantly pointed out to the Radnor board and other members of management that Kennedy had a conflict of interest due to his guaranty of the Tennenbaum debt and, consequently, Kennedy could not be acting in Radnor's best interest.  Galardi urged the Radnor board and general counsel to act and vote according to Galardi's instructions or risk liability in the event of a bankruptcy filing.

147.    According to Galardi, Kennedy and the other Radnor board members would be deemed as attempting to entrench themselves at the expense of other creditors of Radnor. Meanwhile, Skadden, Lehman and A&M were the parties who were actually and knowingly conflicted.  Their conduct and actions speaks volumes now that the true nature of their relationships with Tennenbaum and other Radnor advisors has been exposed.

148.    On August 21, 2006 (the "**Petition Date**"), Radnor and its affiliates issued a press release and filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the Bankruptcy Court initiating the case of In re Radnor Holdings Corporation, et al.[38]

149.    The bankruptcy filing included a motion to sell substantially all of the Debtors' assets, establishing Tennenbaum as the stalking horse bidder.

150.    Kennedy continued to work on the restructuring, however, now the restructuring plan was

[38]    Radnor Holdings Corporation; Benchmark Holdings, Inc.; Radnor Asset Management, Inc.; Radnor Chemical Corporation; Radnor Delaware II, Inc.; Radnor Investments II, Inc.; Radnor Investments III, Inc.; Radnor Investments Inc.; Radnor Investments, L.L.C.; Radnor Management Delaware, Inc.; StyroChem Delaware, Inc.; StyroChem Europe Delaware, Inc.; StyroChem GP, L.L.C.; StyroChem LP, L.L.C.; WinCup Europe Delaware, Inc.; WinCup GP, L.L.C.; WinCup Holdings, Inc.; StyroChem U.S., Ltd.; WinCup LP, L.L.C.; WinCup RE, L.L.C. ; and WinCup Texas, Ltd.; are collectively referred to herein as "**Radnor**."

a reorganization plan and Kennedy could not get support from Galardi or Springel regarding a restructuring and transaction with the unsecured bondholders despite the improved earnings prospects for Radnor.

151.    In projections prepared by Springel and reviewed by Galardi, Lehman and Radnor's financial team, the restructuring costs related to the payment of advisers, including Lehman, Skadden and A&M totaled $20 million over a 6 month period. Despite these massive costs, Radnor was still generating positive cash flow without any cash support from its European operations.  Clearly Radnor could have completed a consensual restructuring outside of bankruptcy.  The enormous costs of the bankruptcy were prohibitive and deterring other investors.  Galardi was undermining a reorganization and proffering to Radnor management and the board that a reorganization was not in the best interests of Radnor and the unsecured bondholders.  In fact, the only beneficiaries from the bankruptcy were the advisers to Radnor, Lehman, Skadden, A&M, Silver Point and Tennenbaum.

152.    Kennedy continued to get no support from Lehman, Skadden and A&M.  Friedman continued to insist that Kennedy stay close to Skadden, refrain from voting on any matters regarding the bankruptcy sale to Tennenbaum and allow Galardi and Skadden to advise Radnor regarding the bankruptcy and continue to work on restructuring efforts.

153.    Kennedy and the Radnor board were advised by Galardi that the US Trustee was getting involved in the bankruptcy case.  Galardi advised that this was not a good development as the US Trustee could investigate conflicts and bring claims against Radnor's management.

154.    Galardi sought Radnor's permission to fight the appointment of a trustee and told the Radnor board that the unsecured creditor's committee in the bankruptcy case (the "**UCC**") was causing problems in the bankruptcy case.  Galardi advised that it was necessary to fight against the UCC and additional litigation support from Skadden's Washington D.C. office was necessary.  Skadden attorney

Edward Meehan ("**Meehan**") would assist in the litigation against the UCC. Meehan would assist with depositions, draft various motions and represent Radnor in the proceedings before the Bankruptcy Court. Radnor's board approved the addition of Meehan to the Radnor litigation team based on Galardi's representations.

155.    The UCC ultimately filed suit against Tennenbaum and Feliciano to subordinate the secured claims of Tennenbaum. The UCC did not, at any time, pursue litigation against the Radnor board.

156.    Skadden recommended to Kennedy that Radnor's independent committee hire independent counsel to examine the narrow issue of the priority of Tennenbaum's claims and investigate Tennenbaum's conduct regarding dealings with Radnor management. Wilmer Hale was subsequently engaged, at the express recommendation of Skadden.

157.    Wilmer Hale was to deliver a report to the independent director and Radnor board regarding the status of the Tennenbaum secured claims and liens as well and as examination of the conduct of the Radnor officers and any manipulation by Tennenbaum.

158.    In September 2006, in the midst of litigation with the UCC, it was discovered by the UCC that Lehman was surprisingly conflicted and had material connections to Tennenbaum as Lehman had acted as placement agent for the 2004 offering of the Tennenbaum Funds.

159.    The proof of the undisclosed conflict was presented to Lehman by Galardi. Galardi conveniently produced the "placement agency agreement" executed by Lehman and Tennenbaum Capital. Interestingly, Galardi failed to disclose Skadden's material connections, as Skadden was the legal adviser to the Tennenbaum Funds in the same transaction and listed in offering memorands of the Tennenbaum Funds provided investors.

160.    The Radnor board was outraged by the deception by Tennenbaum and/or inept conduct of

Lehman as well as Skadden and held telephone conference calls that evening to discuss the issues and Tennenbaum's involvement.

161.    Kennedy was advised by his counsel Friedman, that the disqualification of Lehman was not something that Kennedy should be concerned with.  Friedman explained that Lehman had conducted a faulty conflicts check and Skadden had been appointed and approved by the Bankruptcy Court, therefore there was nothing that Kennedy or the Radnor board could do about Skadden's involvement and retention as counsel to Radnor. Friedman cited the waiver letter which disclosed a small percentage of the actual conflicts and described those conflicts as immaterial.

162.    The disqualification of Lehman eliminated almost entirely the possibility for of a restructuring plan to reorganize Radnor as Kennedy just lost his financial adviser with only 60 days left till the auction date.   In addition, Tennenbaum and Skadden under the purchase agreement with Tennenbaum, set December 1st as the date of the expiration of the debtor in possession financing arrangement with Silver Point, therefore there was less than a month to complete a reorganization. Lazard Freres, Inc. ("**Lazard**") was eventually retained to take the place of Lehman in the Bankruptcy Case, but despite Kennedy's 20 year relationship with the Lazard team, little or no time remained before the expiration of the Silver Point financing and the sale date.

163.    In October of 2006, Kennedy also met with the UCC at the offices with Lazard of Greenberg Traurig to formulate a company sponsored plan of reorganization without the assistance of Skadden, A&M and Tennenbaum (the "**Company Sponsored Plan**")[39].

164.    The Company Sponsored Plan developed by Kennedy on behalf of Radnor proposed an exchange of the unsecured bonds for equity in the Debtor, combined with the sale of the European operations and subsequent registration of the shares in order to provide liquidity to the unsecured

---

[39] *See Exhibit 22* – Company Sponsored Plan.

creditors and the equity holders. Skadden, Lehman and Tennenbaum not only knew of these plans, but also of the various meetings and phone calls between Kennedy and the bondholders during 2005 and 2006.

165. Tennenbaum and Skadden knowingly, intentionally and willfully undermined and obstructed the efforts of Kennedy and the Radnor board to implement the Company Sponsored Plan. Defendants Feliciano and Springel, together with the Tennenbaum adviser Houlihan Lokey, admitted subsequently that frustrating reorganization was the primary goal established by Tennenbaum many months before Radnor filed for Chapter 11 relief in August 2006.

166. The Company Sponsored Plan was prepared, however, Galardi ultimately never presented to this Court or the UCC, due to Skadden's obstructive conduct and undisclosed conflicts.

167. Lazard and Kennedy discussed the Company Sponsored Plan with the UCC, but the litigation with Tennenbaum and the failure by Galardi to disclose its existence to the UCC or the Court halted any discussions on the topic.

168. Kennedy's repeated pleas to Skadden for assistance in reorganizing Radnor were routinely ignored.

169. Galardi again warned Kennedy to stay away from the UCC litigation and advised that Kennedy would be held personally responsible for interfering in the litigation process.

170. Galardi and Springel were consumed by the UCC litigation and appeared in court nearly every day during the pendency of the litigation. Springel, Radnor in-house counsel, Caroline Williamson and former Radnor CFO, Michael Valenza were in court nearly every day as well, testifying as directed by Galardi and Meehan.

171. Galardi demanded that information regarding or accounts of the testimony given in the Bankruptcy Court or in depositions regarding this matter be kept from Kennedy as Kennedy was

allegedly a "key witness" and his testimony should not be tainted by listening to other testimony.

172.    Kennedy testified at a deposition in October of 2006.  The deposition was attended by Meehan, Friedman, Milbank as counsel for Tennenbaum, and Greenberg Traurig.

173.    Kennedy testified at trial in the UCC litigation on November 6, 2006 and November 9, 2006 having never read any of the depositions of the parties or testimony before Judge Walsh as instructed by Skadden and his counsel, Stuart Friedman.

174.    Friedman, throughout the litigation, recommended that Kennedy remain focused on restructuring Radnor and allow Friedman to review the hearing transcripts.  Kennedy was asked not to read the transcripts and to refrain from discussing the case with other members of Radnor's management to avoid the appearance of tampering witnesses at trial.

175.    Galardi and Friedman over the nearly 8 weeks during the litigation, never disclosed to Kennedy, the numerous conflicts between Skadden and Tennenbaum, the frequent and repeated attempts by the US Trustee to disqualify Skadden, the testimony by the parties as to the manipulation by Tennenbaum of the Radnor advisers and the concerns by Judge Walsh as to the conflicts appearing on the record.

176.    Ultimately, the Bankruptcy Court ruled in favor of Tennenbaum on all counts in the UCC litigation and failed attempt to recharacterize the Tennenbaum debt and stated in its opinion that Kennedy, at all times, acted in the best interest of the stakeholders of Radnor.

177.    Thereafter, a sale date was set for November 29, 2006 and Galardi informed Kennedy that the UCC was not interested in continuing discussions with Kennedy regarding restructuring.  Galardi advised Kennedy that the UCC was working with other investors and operating partners to formulate a competing bid and, consequently, was adverse to Kennedy.  Galardi further advised Kennedy that he should be concerned about his claim, that his position was hopeless and to expect an objection brought by

the UCC, Tennenbaum and the US Trustee.  In fact, emails obtained by Kennedy demonstrate that these statements were untrue and that the UCC were in fact, upset to learn that Kennedy had a plan that was never presented to them or the Court by Skadden or Lehman.

178.    In fact, Galardi advised Kennedy and Friedman that $4 million in cash and financing was necessary to replace Silver Point.  Silver Point's financing was set to expire on December 1, 2006.  Unless Kennedy was able to put up a cash deposit and obtain financing through March 2007, no reorganization plan would be submitted to the Bankruptcy Court.

179.    Kennedy continued to speak with investors and financers while Lazard canvassed the market but, there was little time and investors were willing to outbid Tennenbaum and the window of time for Kennedy to secure commitments was quickly closing.

180.    The sale of Radnor closed on November 29, 2006, less than one year from the date Tennenbaum purchased the secured bonds from Silver Point and Silver Point was repaid for the debtor-in-possession financing it extended to Radnor.  Shortly thereafter, Tennenbaum refinanced with Morgan Stanley and its existing bank group.

181.    Subsequent to the sale, Tennenbaum utilized restructuring details of the Company Sponsored Plan to its own benefit and enjoyed a windfall from the sale of the Radnor assets.  The sale of the Radnor assets resulting in nearly $100 million in cash proceeds to Tennenbaum.  Tennenbaum also recorded a $21 million in ficticious gain in December 2006 related to purchase of Radnor assets as reported in filings with the SEC.

182.    Tennenbaum, with the assistance of Houlihan Lokey sold the European assets for $73 million in cash on June 7, 2007, less than 6 months from Tennenbaum's acquisition of the Radnor assets for no consideration.  The same operations, Kennedy was utilizing as part of the restructuring plan combined with the debt for equity exchange with the unsecured bondholders.  The sale of the European assets within six months is prima facie evidence that the restructuring plan, as proposed by Kennedy, was

not only possible, but the most likely outcome and only due to the manipulation, deceit and obstruction by the Defendants allowed Tennenbaum to walk away with the proceeds for themselves.

183.    As a result of the auction process orchestrated by the Defendants, the $135 million unsecured debentures were wiped out upon the sale and another $65 million in unsecured claims were impaired as well as Kennedy's family equity stake, employment contracts and the millions of dollars Kennedy invested in Radnor over a 15 year period.

184.    In July 2007, Kennedy resigned from the Radnor board and Tennenbaum files litigation against Kennedy and Kennedy's affiliated partnership under the guaranty in September of 2007. Ultimately, Tennenbaum obtained a judgment in New York against Kennedy and Kennedy's affiliated partnership which was transferred to Pennsylvania for collection, which Tennenbaum vigorously pursued.

185.    In a February 2008 meeting with Skadden regarding unrelated transactions, Kennedy first learned that Tennenbaum was a "major client" of Skadden and immediately notified Friedman.  Friedman refused to discuss any claim against Skadden and advised Kennedy that since the sale order was already entered and Skadden was not disqualified, any action against Skadden would be futile.

186.    Kennedy filed his objection to confirmation of the plan in the Radnor bankruptcy proceeding and began his arduous task of investigating the Tennenbaum Parties and their actions during the sale process.

187.    Until Kennedy commenced his investigation, he had been distanced from the bankruptcy proceedings and the testimony by the Defendants.  It is clear from the evidence, the Defendants as part of their scheme, took numerous steps to isolate Kennedy, to ensure that Kennedy did not participate in the Bankruptcy Court hearings or the depositions or review any of the testimony in the bankruptcy case. Tennenbaum engaged in a course of action to divert and occupy Kennedy's attention from the bankruptcy case by aggressively pursuing Kennedy and Kennedy's family on the guarantees in state court.  As a

result, Kennedy was precluded from presenting any argument or objection to the sale process and maximizing the true value of the Radnor estate.  Kennedy was justifiably ignorant of many of the pertinent facts and of the gravity of the facts of this case until he began piecing evidence together to form a complete picture.

188.    In preparation for a March 15, 2012 scheduled hearing on confirmation in the bankruptcy proceeding, Kennedy poured over the various transcripts of the trials and hearings before the Bankruptcy Court.  After having been kept in the dark about the proceedings before the Bankruptcy Court at the instruction of Galardi, Kennedy first learned of the US Trustee and the Bankruptcy Court's concerns regarding Skadden's representation of Radnor, Galardi's glaring misrepresentations to the Bankruptcy Court, additional undisclosed conflicts of Skadden including investment in the Tennenbaum Funds, and the extent of the manipulation by the Defendants.

189.    Kennedy launched an exhaustive investigation into the facts and circumstances surrounding this matter.  He collected the evidence set forth herein, pieced together the facts and discovered the true nature of the fraud involved from numerous legal documents, public records, securities filings, his corporate records and the court testimony related to these matters.  Without Kennedy's investigation, Defendants' conspiracy and massive fraud might never have been uncovered.[40]

190.    The full scope of the misconduct and misrepresentations in this case may not have been capable of being pieced together by any other party as a great deal of the evidence was contained in Kennedy's communications with the professionals and their advocates and clients in this case as well as in financial filings with the SEC.  These communications, when coupled with the testimony and omissions of material conflicts in this case, provides a clear picture of the level of misconduct in this case.

---

[40] *See Exhibit 23-* email excerpts of exchange between Kennedy and Feliciano regarding retention of Skadden, waiver and potential conflicts with Tennenbaum.

191.    In his detailed review of email communications and filings with the SEC, Kennedy discovered that Skadden was paid in excess of $3 million in legal fees in 2004 by Tennenbaum despite Galardi's failure to disclose this information to the Bankruptcy Court and Galardi's representations to the Radnor board, the Bankruptcy Court and the US Trustee to the contrary.

192.    Kennedy discovered that well in advance of the bankruptcy filing, Tennenbaum planned to extend debtor in possession financing to Radnor, utilize a 363 sale process, and orchestrate the retention of selected advisers to Radnor in order to eliminate any plan by Radnor to restructure or reorganize.

193.    In February 2012, Kennedy notified his personal counsel of the fraud, deceit and conspiracy that he uncovered through his painstaking review of the transcripts, email communications, SEC filings and other documents.

194.    The true nature of Skadden's relationship with Tennenbaum and the manipulation of the advisers to Radnor was never disclosed to Kennedy, the Radnor board of directors, the US Trustee or the Bankruptcy Court.

195.    Neither Kennedy nor the Radnor board was ever advised that there were potential causes of action against its secured lender, Tennenbaum, and ultimately the depth of material conflicts of its own counsel.

196.    In fact, the Radnor board, despite inquiries by the board of potential conflicts and seven years of prior representation by Skadden, was told by Skadden partners that conflicts involved pertained only to small tax matters.

197.    The Defendants withheld valuable information and misled numerous parties in interest, in order take substantial value for themselves and predetermined who would "walk away" from the proceeds of the bankruptcy.

198.    The absence of potential conflicts is particularly important in bankruptcies and prior to being appointed as bankruptcy counsel; a law firm must disclose any relationships it has with interested

parties, in addition intentional omissions of material facts are considered "acts" and proffering false testimony to hide a scheme or conspiracy as well as misrepresentations to federal officers and the courts are unlawful acts and severely punished under applicable law. [41]

199.     During Kennedy's interviews for suitable restructuring counsel and other financial advisors and throughout the entire Bankruptcy Case, Skadden failed to disclose its prior and ongoing relationship with Tennenbaum and related entities.  In addition, Skadden partners through its dedicated investment company, SK Capital, formed specifically for qualified Skadden partners and employees, invested in the Tennenbaum Funds and potentially other Tennenbaum owned or controlled hedge funds.

200.     Simply put, Skadden not only failed to disclose relationships with Tennenbaum and other parties involved in the bankruptcy proceedings, Skadden took affirmative steps to attempt to hide its relationship with Tennenbaum from Kennedy, the Radnor board, the US Trustee and the Bankruptcy Court.

201.     Before and during the bankruptcy proceeding, Skadden misled and deceived Kennedy, in concert with Tennenbaum, by failing to disclose material connections and conflicts between Skadden, Kennedy, Radnor and Tennenbaum, by making false statements, by filing false affidavits and motions with the Bankruptcy Court, by obstructing Kennedy's efforts to reorganize Radnor, and by participating in the theft of Kennedy's property and the breach of Kennedy's employment agreement.

202.     As demonstrated by the email communications and transcripts, Tennenbaum manipulated the retention process of Radnor's professionals in the bankruptcy case to its exclusive benefit.

203.     Tennenbaum aggressively pursued Kennedy's family business, conspired in violation of numerous laws, and committed fraudulent and egregious acts, involving wanton and reckless gross

---

[41] Hazel-Atlas Glass Co. v. Hartford-Empire Company, 322 U.S. 238, (1944).

misconduct and fraud.  Tennenbaum, also through it misconduct, demonstrated a total disregard for the duties of candor and loyalty.[42]

204.    Tennenbaum took actions and made decisions in the best interest of Tennenbaum rather than in the best interests of Radnor.  The evidence clearly demonstrates that the Defendants conspired amongst themselves to eliminate Kennedy's voting control, terminate his employment agreement and unlawfully gain 100 percent of the equity interest in Radnor by frustrating Kennedy's and the Radnor board's plans to restructure or reorganize Radnor and then sell off the assets of several divisions for their own benefit and to the detriment of Kennedy and Radnor.

205.    The Defendants knowingly assumed a position of trust to Kennedy and betrayed that trust. The Defendants had the knowledge and experience to fully realize and appreciate the nature of their obligations owed to Kennedy and could reasonably foresee the damage that would result from their deception.  The severe misconduct and the fraudulent acts committed by the Defendants herein must be punished and severe sanctions imposed in order to deter those who would commit such egregious acts.

206.    The omissions of material facts and serious conflicts in this case directly caused (i) the obstruction of a restructuring or reorganization of Radnor (ii) the sale of other assets by Radnor which Tennenbaum took for itself, thereby inflicting severe and irreparable harm on the Radnor estate and other parties in interest, including Kennedy.

**STANDING**

207.    Plaintiffs have standing to file the instant causes of action as the former controlling shareholders of Radnor who was directly and indirectly aggrieved and damaged by the actions of the Defendants.

**COUNT I - BREACH OF FIDUCIARY DUTIES**

---

[42] *See Exhibit 2 and Exhibit 20* - testimony before the Honorable Judge Walsh and comments from the Bankruptcy Court regarding Tennenbaum's duty of candor.

208.    Paragraphs 1 through 204 hereinabove are incorporated herein.

209.    The Defendants stood in positions of special trust and confidence to Kennedy and owed various fiduciary duties to Kennedy, including duties of loyalty, care and disclosure.  The Defendants failed to fulfill those fiduciary duties.

210.    Tennenbaum, as a board member of Radnor, owed fiduciary duties to Radnor, Kennedy, its creditors and its investors and breached those duties.

211.    Skadden and the other professionals owed fiduciary duties to their respective clients.

212.    The Defendants failed to fulfill their duty of candor by willfully failing to disclose material facts to Kennedy, Radnor and the Bankruptcy Court and by failing to notify the Bankruptcy Court that the testimony of the professionals was intentionally misleading and false.

213.    Kennedy relied on the Defendants to exercise discretion or expertise to act on his behalf and on behalf of Radnor and the Defendants betrayed this confidence.

214.    The Defendants, individually and collectively, failed to exercise the requisite skill, care and diligence required of fiduciaries.

215.    The Defendants' failure to meet the high standards of honesty and full disclosure in bankruptcy proceedings and disregard to the fiduciary duties each owed to Kennedy and Radnor caused harm and damage to Radnor and Kennedy and resulted in a waste of corporate assets.  The personal benefits derived by the Defendants in this case were obtained at the expense of Kennedy and Radnor.

216.    As officers of the Bankruptcy Court, Skadden attorneys violated their duties of candor and honesty to Radnor, Kennedy, the Bankruptcy Court and the US Trustee.

217.    Skadden failed to fulfill its responsibility to advocate on behalf of and assist Radnor with refinancing its obligations and restructuring its debt by deceiving Radnor, Kennedy and the Bankruptcy Court.

218.     By making false statements and proffering misleading testimony before the Bankruptcy Court, filing false affidavits and by concealing true and material conflicts, Skadden committed fraud upon the Bankruptcy Court and interfered with the process of adjudication.

219.     The lack of disclosure of material facts and conflicts, the absence of fair dealing and the inadequacy of the purchase price for the Radnor assets undercuts the entire sale process approved by the Bankruptcy Court.[43]

220.     Tennenbaum breached its fiduciary duties of candor and fair dealing by failing to disclose the material conflicts and manipulating the sale process and failing to consider the interests of the other stakeholders of Radnor in distributing and committing the assets of Radnor.

221.     As a member of the Radnor board between December 20, 2005 and June 26, 2006, Feliciano owed Radnor a fiduciary duty of care.

222.     Feliciano breached his fiduciary duty of care owed to Radnor by, among other things, approving the retention of Skadden, Lehman and A&M while failing to disclose material connections and conflicts to Kennedy, the Radnor Board and the Bankruptcy Court.

223.     Feliciano's actions and inaction proximately caused damage to Radnor, Kennedy and other investors, for which Feliciano is liable.

224.     Tennenbaum owed Radnor a fiduciary duty of loyalty to act in the best interests of Radnor and its investors.  Tennenbaum breached their fiduciary duties by taking actions and making decisions in the best interest of Tennenbaum and to the detriment of Radnor.

225.     Feliciano abused his insider position as a member of the Radnor board to obtain favorable terms for Tennenbaum by channeling inside financial information about Radnor to Tennenbaum, undermined the board and Kennedy's efforts to restructure Radnor and breached his duty of candor to

---

[43] UOP v. Weinberger

Radnor and Kennedy.  Tennenbaum misused that information to advance Tennenbaum's goal of seizing control of Radnor's assets at the peril of Radnor and establish Tennenbaum as the successful bidder to purchase the Radnor assets, eliminate Kennedy's voting control, employment agreement and equity interests in Radnor.

226.    Feliciano breached his fiduciary duty of loyalty owed to Radnor as a member of the Radnor board, proximately causing damage to Radnor and Kennedy, for which Feliciano is jointly and severally liable along with the Defendants to this action.

227.    The concerted actions by Defendants in this case directly caused damage to Radnor and Kennedy, for which Defendants are jointly and severally liable.

## COUNT II – FRAUD

228.    Paragraphs 1 through 224 hereinabove are incorporated herein.

229.    The Defendants repeatedly made false statements of material facts to Kennedy, representatives of Radnor, the Bankruptcy Court, the US Trustee and other individuals associated with the bankruptcy case.

230.    Each of the Defendants knew that the statements of material fact were untrue.

231.    The Defendants each acted with the intent to deceive Kennedy, Radnor, the Bankruptcy Court, the US Trustee and other parties involved with the bankruptcy case and with intent to deprive Kennedy and Radnor of their respective rights.

232.    Kennedy acted in reasonable and justifiable reliance on the false statements of material fact.

233.    Additionally, the Defendants failed to disclose material facts to Radnor, Kennedy, the Bankruptcy Court, the US Trustee and other individuals involved with the bankruptcy case.

234.    The Defendants were aware of their non-disclosure.

235.    The failure of the Defendants to disclose material facts caused Kennedy to have a false impression.

236.    Defendants knew that their failure to disclose material facts would cause Kennedy to have a false impression.

237.    Defendants intended to create a false impression.

238.    In the U.S. Supreme Court, <u>Hazel-Atlas Glass Co. v. Hartford-Empire Company</u>, 322 U.S. 238, (1944) an attorney may commit fraud on the court, not only through misrepresentation, but also through omission.    Also in <u>Hazel-Atlas</u> "it is a wrong...which ...cannot complacently be tolerated consistently with the good order of society… involv[ing] two victims: the individual litigant …and the court itself, whose integrity is compromised by the fraudulent behavior of its officers.) "The very temple of justice is defiled."

239.    By making false statements to Kennedy, proffering misleading testimony before the Bankruptcy Court, filing false affidavits and concealing true and material conflicts, Defendants committed fraud upon the Bankruptcy Court and interfered with the process of adjudication.

240.    The Defendants' scheme exhibits a propensity to commit fraud and a pattern of deceit and their willful, purposeful, unlawful acts demonstrate a vast conspiracy among the Defendants. The Defendants knowingly and intentionally committed fraud upon Kennedy, the Bankruptcy Court and other creditors and parties in interest.

241.    Skadden knew that the non-disclosure described herein would harm Radnor and Kennedy and would directly benefit of Skadden and its valued and "major" client, Tennenbaum.

242.    The Defendants knew or reasonably should have known that the Radnor board would not hire Skadden, Lehman or A& M if the true nature of the relationships described herein were disclosed to the Radnor board and Kennedy.

243.    The Defendants knew or reasonably should have known that there was a very high risk that Lehman and Skadden would be disqualified if the conflicts described herein were disclosed to the Bankruptcy Court or the US Trustee.    Skadden and Tennenbaum failed to make the appropriate disclosures required in attorney-client relationships under the Bankruptcy Code.

244.    The concerted actions of the Defendants directly caused damage to Kennedy and Radnor for which the Defendants are jointly and severally liable.

## COUNT III - CONSPIRACY TO COMMIT FRAUD

245.    Paragraphs 1 through 241 hereinabove are incorporated herein.

246.    The Defendants acted together based on an agreement or a series of agreements to perpetrate fraud on Radnor, Kennedy and the Bankruptcy Court.

247.    The Defendants acted in concert with each other in their fraudulent endeavors.

248.    The Defendants collective actions violated the law, the rules of the Bankruptcy Court, and applicable rules of professional conduct.

## COUNT IV - MALPRACTICE

249.    Paragraphs 1 through 245 hereinabove are incorporated herein.

250.    The Defendants each owed a duty to the Radnor board of directors, Kennedy as a former client and/or its majority shareholder, owner and the Chief Executive Officer of Radnor.

251.    The Defendants, individually and collectively, breached duties owed to Kennedy and Radnor.

252.    Plaintiffs suffered significant harm as a result of the breach of duties owed to Kennedy and Radnor by the various professionals in the bankruptcy case.

253.     The damages Plaintiffs suffered include, but are not limited to monetary loss, loss of thier business interests, proceeds from the sale of assets, loss of employment, and loss of business opportunities.

254.    The evidence clearly demonstrates that Skadden misled the Radnor board, Kennedy, breached their duties of candor and loyalty to the Plaintiffs as a client and violated thier trust by conspiring with Tennenbaum, failing to disclose the nature of Skadden's relationship with Tennenbaum, failing to disclose other material conflicts and connections, making false and misleading statements to Kennedy, the Radnor board, the US Trustee and the Bankruptcy Court, obstructing Kennedy and the Radnor board's efforts to reorganize, aiding and abetting the theft of Kennedy's property and the breaches of various agreements, including the Employment Agreement, from which Kennedy derived significant income, knowingly and intentionally deceiving Kennedy and the Radnor board and committing egregious acts of fraud upon Radnor, Kennedy, Kennedy's family and Kennedy's business.

**COUNT V - PERJURY**

255.    Paragraphs 1 through 251 hereinabove are incorporated herein.

256.    The Defendants made false statements under oath or equivalent affirmations during a judicial proceeding by giving false testimony before the Bankruptcy Court and submitting false affidavits.

257.    The false statements offered by the Defendants were material and highly relevant to the bankruptcy proceedings.

258.    When the Defendants offered false testimony to the Bankruptcy Court and submitted false affidavits, the Defendants acted with specific intent to deceive Kennedy, Radnor and the Bankruptcy Court.

259.    In a factually similar case, United States v. Gellene, 182 F.3d 578 (7th Cir. 1999), the Seventh Circuit explained that a statement is made "fraudulently" for purposes of 18 U.S.C. §152[44] if it

---

[44] 18 U.S.C. §152 states that "a person who (1) knowingly and fraudulently conceals from a custodian, trustee, marshal, or other officer of the court charged with the control or custody of property, or, in connection with a case under title 11, from creditors or the United States Trustee, any property belonging to the estate of a debtor; (2) knowingly and fraudulently makes a false oath or account in or in relation to any case under title 11; (3) knowingly

53

is made "with [an] intent to deceive" and rejected the defendant's argument that section 152 is limited to "false statements that deprive the debtor of his property or the bankruptcy estate of its assets." <u>Id</u>. at 586. The court arrived at its holding after finding "whether the deception at issue is aimed at thwarting the bankruptcy court or the parties to the bankruptcy, section 152 is designed to protect the integrity of the administration of a bankruptcy case."

### COUNT VI - UNJUST ENRICHMENT

260.    Paragraphs 1 through 256 hereinabove are incorporated herein.

261.    The Defendants were enriched by their actions during the bankruptcy case.

262.    The enrichment enjoyed by the Defendants was obtained at the expense of Kennedy and Radnor.

263.    The Defendants acted without justification and there is no valid defense to justify their actions.

264.    There is no adequate remedy available at law to redress Plaintiff's damages.

---

and fraudulently makes a false declaration, certificate, verification, or statement under penalty of perjury as permitted under section 1746 of title 28, in or in relation to any case under title 11; (4) knowingly and fraudulently presents any false claim for proof against the estate of a debtor, or uses any such claim in any case under title 11, in a personal capacity or as or through an agent, proxy, or attorney; (5) knowingly and fraudulently receives any material amount of property from a debtor after the filing of a case under title 11, with intent to defeat the provisions of title 11; (6) knowingly and fraudulently gives, offers, receives, or attempts to obtain any money or property, remuneration, compensation, reward, advantage, or promise thereof for acting or forbearing to act in any case under title 11; (7) in a personal capacity or as an agent or officer of any person or corporation, in contemplation of a case under title 11 by or against the person or any other person or corporation, or with intent to defeat the provisions of title 11, knowingly and fraudulently transfers or conceals any of his property or the property of such other person or corporation; (8) after the filing of a case under title 11 or in contemplation thereof, knowingly and fraudulently conceals, destroys, mutilates, falsifies, or makes a false entry in any recorded information (including books, documents, records, and papers) relating to the property or financial affairs of a debtor; or (9) after the filing of a case under title 11, knowingly and fraudulently withholds from a custodian, trustee, marshal, or other officer of the court or a United States Trustee entitled to its possession, any recorded information (including books, documents, records, and papers) relating to the property or financial affairs of a debtor, shall be fined under this title, imprisoned not more than 5 years, or both.

265.     The Court has a substantial interest to provide a fair and level playing field to all parties in the process of a bankruptcy reorganization and sale.[45]

266.     Defendants were unjustly enriched and must disgorge any benefit derived from their deceit.   Plaintiff requests the imposition of a constructive trust against Tennenbaum to recover the assets, proceeds from the sale of the European business sold subsequent to the unlawful taking and theft of business interests denied Kennedy, in addition to any fees or expenses paid to the Defendants.

267.     The Defendants unjustly acquired and retained the benefit of the sale of the Radnor assets to the direct detriment of Kennedy and Radnor.

268.     The Defendants acts of fraud and their misconduct are contrary to the fundamental principles of justice, equity or good conscience.

269.     Kennedy has suffered and will continue to suffer impoverishment as a result of the fraudulent taking of Kennedy's assets, the breaches of material contracts including his Employment Agreement and the subsequent sale of the European assets, without justification and the absence of a suitable remedy provided by law.

270.     Defendants, individually and collectively, aided and abetted Tennenbaum's misconduct, fraud and breaches of fiduciary duties.  Defendants acted in concert and were enriched by their actions, to the impoverishment of Kennedy.[46]

271.     A clear relationship exists between the enrichment of Defendants and impoverishment of Kennedy.  Defendants cannot retain any benefit resulting from their deceit.  Their retention cannot be justifiably supported or found to be in accordance with the fundamental principles of justice or equity and good conscience.

---

[45] Hazel-Atlas Glass Co. v. Hartford-Empire Company, 322 U.S. 238, (1944).

[46] *See Exhibit 24* - schedule of fees paid by Tennenbaum to Skadden and Lehman in 2004 and 2005 incorporated by reference herein.

272.    A constructive trust should be imposed to correct the wrongful acts of the Defendants, who acts and misconduct were, at a minimum, fraudulent, unfair or unconscionable.

273.    The principles of equity dictate that the Defendants must return all fees paid, compensation and distributions received as well as property of Kennedy held at any time relevant hereto by them or paid to them as a result of their acts of deception and fraud.

## COUNT VII - OBSTRUCTION OF JUSTICE

274.    Paragraphs 1 through 270 hereinabove are incorporated herein.

275.    The Defendants' actions obstructed, impeded and hindered the administration of justice in the bankruptcy case.

276.    The Defendants knowingly altered facts, concealed material facts, covered up wrongdoing, offered falsities and made numerous false statements on the record during the bankruptcy case with the intention to impede, obstruct, or influence the proper administration of justice in the bankruptcy proceeding.

## COUNT VIII - BREACH OF CONTRACT

277.    Paragraphs 1 through 273 hereinabove are incorporated herein.

278.    Skadden and A&M breached their agreements with Radnor by misrepresenting the true relationships with Tennenbaum and failing to disclose material conflicts, to perform their services in good faith and without conflict to the detriment of Radnor and Kennedy.

279.    Kennedy's Employment Agreement with Radnor was a valid and enforceable contract.

280.    Kennedy tendered performance in accordance with the Employment Agreement by offering his services to Radnor.

281.    Defendants breached the terms of the Employment Agreement by dismissing Kennedy without proper notice or severance as provided under the Employment Agreement.

56

282.    Kennedy was significantly harmed by the Defendants' breach of the Employment Agreement.

283.    Kennedy's damages included but were not limited to loss of income and loss of business opportunities.

## COUNT IX - TORTIOUS INTERFERENCE

284.    Paragraphs 1 through 280 hereinabove are incorporated herein.

285.    The Defendants, individually and collectively, intentionally damaged Kennedy's contractual and business relationships.

286.    Contractual and beneficial business relationships existed between Kennedy and various other parties.

287.    The Defendants had actual knowledge of the relationships between Kennedy and various parties.

288.    The Defendants acted with intent to induce the various other parties which shared contractual and beneficial business relationship with Kennedy to breach those relationships.

289.    Defendants acted without privilege.

290.    As a result of the Defendants' actions, various contractual and beneficial business relationships with Kennedy were breached.

291.    Kennedy suffered significant monetary and non-monetary damages as a result of the breaches of contractual and beneficial business relationships.

## COUNT X - THEFT BY DECEPTION

292.    Paragraphs 1 through 288 hereinabove are incorporated herein.

293.    The Defendants obtained property or services of Kennedy and the assets of Radnor by deception with the intent to deprive Kennedy of the benefit of such property and services.

294.     The Defendants created and/or reinforced false impressions to Kennedy with the intention to strip Kennedy of property or the value of Kennedy's services.

295.     At no time relevant hereto did the Defendants attempt to correct the false impressions they created or reinforced or knew to be influencing Kennedy, a party to whom the Defendants owed fiduciary duties.

## RESERVATION OF RIGHTS

296.    Kennedy's investigation is ongoing and Kennedy reserves the right to bring additional claims and assert additional causes of action as additional facts become known to him at a later date.  In addition, other advisers to Radnor, Kennedy and Tennenbaum may have known of the material conflicts and, under pressure exerted by the Defendants, failed to disclose such conflicts.

## DAMAGES

297.    Defendants also acted as conspirators, operated in a concerted effort to deceive Radnor, Kennedy and the Bankruptcy Court and should be found jointly and severally liable in the aggregate for damages.  This Honorable Court should consider severe punishments or sanctions which would properly deny the Defendants' respective abilities to operate within the securities industry and before the bankruptcy courts, as may be required, given the egregious acts and aggravating circumstances found in this case.

298.    The fraudulent acts committed by the Defendants are so egregious, the facts so aggravating that they defile the basic principles of justice, good faith and fair dealing.  Defendants interfered with the process of adjudication within our courts. Considering the egregious nature and aggravating circumstances surrounding the Defendants misconduct, the vast number of defendants involved, the length of time and methods utilized to the conceal their nature, the clear deceptive practices and lack of candor to those to which they held duties under the law. The seriousness of the misconduct justifies severe punishment as it defiles the very temple any sense of justice expected in our courts.[47]

299.    Given the relative size of the Defendants' revenues, which are in the billions of dollars annually, multiple factors of punitive damages would need to be levied to have a punitive effect, and in order to deter others who would seek to mislead and obstruct the process of justice operating within our

---

[47] Hazel-Atlas Glass Co. v. Hartford-Empire Company, 322 U.S. 238, (1944)

courts.  In order to deliver sufficient justice and retribution, the damages should be levied against Defendants and in relation to the revenues of the Defendants.

300.    Defendants' improper and inequitable strategy to acquire Radnor's assets, as more specifically alleged in this Complaint, forms the basis for a judgment in favor of the Plaintiffs and an award for damages to compensate for the loss of property, including but not limited to: (i) the value of their equity in Radnor, (ii) compensation due Kennedy under his contracts and (iii) proceeds of assets unlawfully taken through Defendants acts of deception.

**WHEREFORE**, Plaintiffs respectfully requests that this Honorable Court enter an order as follows:

A.    Awarding compensatory damages to Plaintiffs sufficient to place Radnor, Kennedy and other parties in interests in the position before the acts of fraud were committed in the amount in excess of $75 million;

B.    Ordering imposition of a constructive trusts to recover property unlawfully taken from Plaintiffs;

C.    Voiding the sale of the Radnor assets and reinstituting cancelled contracts, including Kennedy's Employment Agreement; and

D.    Invalidating certain Releases granted under the Confirmation Order;

E.    Disgorging fees, expenses and distributions received by the Defendants;

F.    Awarding interest from the date the fraud was initially committed upon Plaintiffs;

G.    Awarding punitive damages; and

H.    Ordering such other relief and sanctions as reasonable and just under the circumstances.

Date:  December 26, 2012                    /s/ Michael T. Kennedy
                                            _____

                                            Michael T. Kennedy
                                            And also on behalf of Radnor Holdings
                                            Corporation and the Kennedy Family Trusts

                                            4020 Foxhill Lane
                                            Newtown Square, PA 19087

## <u>VERIFICATION</u>

I, Michael T. Kennedy, hereby certify that I am a Plaintiff in this action.  The facts set forth in the forgoing Complaint are true and correct to the best of my knowledge, information and/or belief.  I make this statement with the understanding that I am subject to penalties under the Rules of Civil Procedure should it be determined that any of the foregoing facts are knowingly false.


/s/ Michael T. Kennedy
_____

Michael T. Kennedy


Dated:  December 26, 2012